**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Mark SPUDIC and Rutilo Ochoa,**
**Defendants-Appellants.**

**Nos. 85–2282, 85–2283.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 27, 1986.
Decided July 11, 1986.

Richard L. Darst, Indianapolis, Ind., Itsia Doris Rivera, East Chicago, Ind., for plaintiff-appellee.

Patrick Hansen, Asst. U.S. Atty., Hammond, Ind., for defendants-appellants.

Before WOOD, FLAUM, and RIPPLE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This case arises from a twenty-seven count indictment returned on January 17, 1985, charging seven defendants [1] with various crimes growing out of their business or procuring and marketing stolen motor vehicles in interstate commerce,[2] their specialty being vans and pickup trucks. Only two of the defendants, Ochoa and Spudic, are involved in this appeal after being found guilty in a jury trial.[3]

Spudic complains that the counts charging interstate transportation of a stolen motor vehicle and the counts charging concealment of the same motor vehicle are multiplicitous; that the evidence is insufficient; that no offense of mail fraud was stated; and that the sentencing process was flawed because the trial judge made use of a "sentencing commission" composed of a number of probation officers from which the defendants and their attorneys were excluded.

Ochoa likewise questions the sufficiency of the evidence denying that he was a member of the charged conspiracy. Instead, he claims, he was involved only and separately with Arturo Garcia, a government informant which, he says, could not constitute a conspiracy.

---

1. John Salazar, Manuel Salazar, and Kenneth Huff, although prominently mentioned in this indictment, are not named as defendants, but were charged in a separate case. It appears that they were the top executives of this loosely organized operation.

2. Spudic was charged with one count of conspiracy under 18 U.S.C. § 371; with two counts of knowingly transporting or causing the transportation of stolen motor vehicles in interstate commerce in violation of 18 U.S.C. §§ 2312 and 2; with two counts of knowingly concealing stolen motor vehicles which were a part of or constituted interstate commerce in violation of 18 U.S.C. § 2313; and four counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2.

Ochoa was charged with one count of conspiracy, in violation of 18 U.S.C. § 371; one count of knowingly receiving a stolen motor vehicle which constituted and was a part of interstate commerce in violation of 18 U.S.C. § 2313; one count of knowingly transporting a stolen motor vehicle in interstate commerce in violation of 18 U.S.C. §§ 2312 and 2; and four counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 2.

3. Spudic was sentenced to five years imprisonment for conspiracy, five years imprisonment on each of two counts of transporting stolen motor vehicles and concealing stolen motor vehicles, and four counts of mail fraud to run concurrently with each other and consecutively with the conspiracy sentence.

Ochoa was sentenced to five years imprisonment for conspiracy, five years imprisonment for receiving stolen property, five years imprisonment for transportation of a stolen motor vehicle (to run consecutively with the receiving charge), and five years imprisonment suspended on four counts of mail fraud with probation for five years on each count running concurrently with the sentence imposed on the previous counts.

It can at least be said for Spudic and Ochoa that they were not the conspiracy's top executives. The executives were John and Manuel Salazar, and Kenneth Huff. After the stolen vehicles were acquired they were stored in various locations where they could be adapted for the stolen vehicle market by the installation of false vehicle identification number ("VIN") plates and a change of ignition and door locks. The coconspirators assisted in various ways by obtaining the stolen vehicles, doing the identification conversions, procuring the documentation, and delivering to buyers.

 Both defendants attack their conspiracy convictions, but from slightly different angles. Ochoa sees in the evidence only multiple conspiracies, not one, and claims that he was not and could not be a part of any of them. Spudic's view is that he was not a member of the charged conspiracy. The conspiracy, as appears from the evidence, however, was a continuing enterprise and did not turn into a different enterprise every time a different motor vehicle or person became involved. It was not a situation where each transaction was separate and apart from the general business enterprise. Each was part of the whole. *United States v. Varelli*, 407 F.2d 735, 742 (7th Cir.1969). There remained one agreement, express or implied, among the various coconspirators to contribute in different ways at different times in furtherance of their stolen car business for their mutual benefit. There was no other goal. *United States v. Read*, 658 F.2d 1225, 1230 (7th Cir.1981), makes it clear that it is not necessary for each coconspirator even to agree to or actually participate in every step of the conspiracy. A coconspirator is bound by the overt acts of other coconspirators furthering the conspiracy both before and after being enlisted even though he may not participate in each overt act. A coconspirator need not be, and often is not, aware of everything being done to further the conspiracy. In this case, each defendant on a regular basis made contributions to the marketing of the stolen vehicles, and that was enough to make them coconspirators. *Blumenthal v. United States*, 332 U.S. 539, 556–57, 68 S.Ct. 248, 256–57, 92 L.Ed. 154 (1947). *Blumenthal* also reminds us that conspiracies involving elaborate arrangements generally are not born full-grown, but rather mature in successive stages as other parties are added who may not know all that has gone before. *Id.* Nonetheless, these new members assume the risk. So it is in the present case.

 The existence of a single conspiracy here is evident and unmistakable, and it is also clear that both defendants unceremoniously joined it. The common conspiracy rule provides that once a conspiracy has been established only slight additional evidence is required to support a finding of membership. *United States v. Baskes*, 687 F.2d 165, 167 (7th Cir.1981). Whatever evidence there is must be viewed at this appellate stage in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and therefore the defendant has a heavy burden to show that the evidence was so insufficient that a jury could not find guilt beyond a reasonable doubt. *United States v. Silva*, 781 F.2d 106, 108 (7th Cir.1986). We shall briefly examine portions of the relevant evidence which we find to be sufficient for a properly instructed jury to conclude that the defendants were members of the conspiracy as well as being guilty beyond reasonable doubt of certain of the substantive counts.

## DEFENDANT OCHOA

Defendant Ochoa endeavors to separate himself from the conspiracy by claiming he did not share the illegal objectives of the other conspirators since their goal was to steal motor vehicles, and his was "merely" to purchase the vehicles. He claims the evidence was insufficient to show that he was even aware the vehicles were stolen.

The evidence, however, is otherwise. A stolen pickup truck was recovered from Ochoa, and a stolen van was recovered from his wife. The pickup truck had two inconsistent VIN tags, the true one covered

over on the dashboard, and a fictitious one attached to the door post. The evidentiary details were filled in by Arturo Garcia, who cooperated with the government by working underground on the investigation. Garcia testified that he had a meeting with Ochoa at Ochoa's home in Illinois concerning a truck the defendant wanted. Ochoa said that he was still interested but wanted to check it out. Garcia and Ochoa then proceeded to Indiana for that purpose. When inspecting the truck Ochoa complained that the truck had two different VIN's, a very risky way to conceal a stolen motor vehicle. He therefore declined to pay full price because of the careless job of retagging. However, he took the truck and drove it back to Illinois.

Ochoa was also present at a conversation with the Salazars, the chief executive officers of the enterprise, Garcia, and another person concerning efforts to obtain clean documentation for a stolen Trans Am automobile. Again, later in 1984 Ochoa and Garcia discussed by telephone Ochoa's arrangement with the Salazars regarding a 1982 Buick Riviera. Ochoa wanted Garcia to assist in obtaining the documentation. Later Ochoa visited Garcia's home and discussed the car theft racket generally and in particular the documentation for the Buick. Sometime after that Ochoa paid $1,000 to Garcia as a down payment on the paperwork for the Buick. Ochoa and Garcia then went to the home of another individual where the Buick was stored. Ochoa expressed concern about the car being stored in that unsavory Illinois neighborhood because, he said, there were a large number of "hot cars" stored in the vicinity. Garcia followed Ochoa's advice and returned the car to Indiana. Also, one recorded telephone conversation between Ochoa and Garcia reveals Ochoa's complaint about slow delivery of a Lincoln automobile. If it was not to be delivered promptly, Ochoa threatened that he would stop doing business with Garcia.

 The evidence showed Ochoa's involvement with the coconspirators in con-

nection with a 1978 Pontiac Firebird Trans Am automobile, a 1982 Buick Riviera, a 1980 Chevrolet pickup truck and a 1983 Chevrolet van. Ochoa cannot cast himself as an ordinary innocent buyer merely taking advantage of some exceptionally low-priced vehicle deals. Nor can he rely on *United States v. Ford,* 324 F.2d 950 (7th Cir.1963), or *United States v. Varelli, supra,* to keep him out of the conspiracy. In *Ford* there was no more than the defendant's purchase of one stolen watch. Since there was no contemporaneous understanding beyond this one purchase, it was held that the buyer-defendant was not a member of the conspiracy. 324 F.2d at 952. Likewise, in *Varelli,* no overall conspiracy was found because the hijacking of a load of cameras was a separate transaction distinct from the other hijackings of silver. There was no contemplation of a series of hijackings. A single act performed with parties involved in more than one conspiracy may be insufficient to permit the inference of the existence of one overall agreement. 407 F.2d at 743–44. *Varelli,* however, supports the theory underlying the present case that an overall conspiracy may be shown which is constituted by a small group of core conspirators, in the present case the Salazars, with whom various other coconspirators knowingly participate to achieve a common goal. *Id.* at 741–42. The formalities of legitimate business agreements are usually dispensed with in the interest of secrecy, but the illegitimate agreement can be seen in the concert of action, the working together of the parties with a single design for accomplishment of a common purpose. The evidence shows that Ochoa was more involved in the overall scheme than a mere random and occasional customer of this conspiracy. Nor is there a requirement that coconspirators always be agreeable with each other, so that on occasion when Ochoa would complain about the negligent tag conversion, the price, or a delivery delay, he did not thereby insulate himself from the conspiracy.[4]

---

4. Since the jury properly found Ochoa to have

been a member of the overall conspiracy, we

■ Ochoa was charged with mail fraud counts 24 through 27, even though we find no evidence he personally did or caused the mailings. The government supports these convictions on the basis that once a conspiracy is formed, and a person joins that conspiracy, he is responsible for the actions of each other coconspirator whether he agrees to the particular action or not, so long as the action is done in furtherance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946). It is further argued that the criminal intent to do the act is established by the formation of the conspiracy as it is considered that each conspirator instigated the commission of the crime. It was formed for that purpose and the act was done in the execution of the enterprise. Relying on *Pinkerton* the government argues that the evidence shows that the mail fraud "occurred by coconspirators" after Spudic and Ochoa had joined the conspiracy. Simply stated the government's theory is that once finding the conspiracy, the jury could impute the substantive mail counts to all coconspirators. That can be true, but the jury must first be properly instructed, be given a so-called "*Pinkerton* instruction," but it was not.

■ To rely on the conspiracy to prove substantive crimes the jury must first be told the necessary prerequisites. Only recently this court thoroughly examined this problem. *United States v. Manzella,* 791 F.2d 1263, 1267–68 (7th Cir.1986). As the defendant points out, the jury was not instructed on the elements of the *Pinkerton* doctrine, and the doctrine was not invoked by the government prior to this appeal. In *Manzella* the court at least gave an abbreviated *Pinkerton* instruction, but in this case none was given. Possibly had the necessary instruction been given, the jury would have found the defendant guilty as it did without the instruction. However, we cannot reconstruct the evidence, apply the *Pinkerton* instruction in this court, and conclude that guilt has been proven beyond a reasonable doubt. As set forth in *Manzella,* at 1267–68 this court in *United States v. Zabic,* 745 F.2d 464, 474–75 (7th Cir.1984), upheld a *Pinkerton* instruction, which *Manzella* found "contains every *Pinkerton* element, arranged in an order calculated to maximize the likelihood that the jury will grasp this complicated concept." At 1268[5] The substantive mail fraud convictions, in view of a serious deficiency in the instructions, cannot stand and are therefore vacated.

■ Ochoa was also charged with one count of knowingly receiving a stolen motor vehicle which constituted and was part of interstate commerce in violation of 18 U.S.C. § 2313, and one count of knowingly transporting a stolen motor vehicle in interstate commerce in violation of 18 U.S.C. §§ 2312 and 2. The stolen motor vehicle which Ochoa is charged with knowingly receiving is the 1980 Chevrolet pickup truck recovered from him with the two VIN tags about which he had earlier complained to his coconspirators. The stolen vehicle which Ochoa was charged with

need not reach the issue posed by Ochoa's challenge that he could not be a coconspirator with Garcia, since Garcia was a government informant.

5. The approved *Pinkerton* instruction given in *Zabic* is:

If you find that the defendant is guilty of conspiracy as charged in Count One, you may also find the defendant guilty of a substantive offense as charged in any other count of the indictment, provided that you find that the essential elements of that count as defined in these instructions have been established beyond reasonable doubt, and provided that you also find beyond reasonable doubt,

First, that the offense defined in the substantive count was committed pursuant to the conspiracy, and

Second, that the defendant was a member of the conspiracy at the time the substantive offense was committed.

Under the conditions just defined a defendant may be found guilty of a substantive count even though he did not participate in the acts constituting the offense as defined in the substantive count. The reason for this is that a co-conspirator committing a substantive offense pursuant to a conspiracy is held to be an agent of the other co-conspirators.

transporting in interstate commerce was the 1982 Buick Riviera. Because Ochoa was concerned about the bad neighborhood in which the Buick was being temporarily stored he directed Garcia to take it back to Indiana, to have the paper work finished, and to retag and store it for him.

Ochoa's guilt, except for the mail fraud counts, as found by the jury, is obvious.

## DEFENDANT SPUDIC

Spudic raises various other issues which we must resolve against him, except for the mail fraud counts, counts 24 through 27, which are reversed for the same reasons that Ochoa's convictions were reversed on the same counts. Ochoa helped dispose of stolen vehicles whereas Spudic retagged them for disposition. The evidence showed that at Manuel Salazar's suggestion Spudic travelled from Indiana to Chicago to retag the stolen 1978 Trans Am automobile for a knowing buyer who thereafter applied for a fictitious title. Spudic was similarly involved with a 1978 Ford custom van and a 1977 Ford pickup truck. The evidence was sufficient to show Spudic attached fictitious VIN's to each of these stolen vehicles. At John Salazar's direction Spudic also removed one of the truck's door lock cylinders in order to take it to have new keys made. The truck was destined for a customer in Illinois. Some of Spudic's retagging expertise was witnessed by Garcia and some was based on coconspirator hearsay. Spudic's retagging contribution to the stolen car business was an integral part of its successful operation.

 Spudic challenges his convictions on the counts charging interstate transportation of a stolen motor vehicle [6] and the count charging concealment of the same vehicle on multiplicity grounds.[7] The particular circumstances tend to cloud the ba-

sic analysis. These transportation and concealing charges are directly attributable to only one personal act of Spudic with the vehicle. He changed its VIN. Spudic contends that this action could not, in and of itself, constitute both concealing and transporting a stolen vehicle. Indeed, he makes a plausible argument based on the misapplication of *Milanovich v. United States*, 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961), in which the Supreme Court held that a defendant could not be convicted of both stealing and receiving the same property under 18 U.S.C. § 641 which prohibited, among other things, theft, receipt, and concealment of property of the United States. *Id.* at 553–54, 81 S.Ct. at 729–30. That is not a startling decision because as Justice Frankfurter stated in dissent, viewing only the factual circumstances differently than the majority, "a man who takes property does not at the same time give himself the property he has taken." *Id.* at 558, 81 S.Ct. at 732.

Spudic refers us to two other cases, *United States v. Neighbors*, 515 F.2d 796 (8th Cir.1975) (per curiam), and *United States v. Sanders*, 538 F.2d 695 (5th Cir.) (per curiam), *cert. denied*, 429 U.S. 985, 97 S.Ct. 504, 50 L.Ed.2d 596 (1976). In both *Neighbors* and *Sanders* the courts avoided reaching the merits of the multiplicity issue by relying on the concurrent sentence doctrine which they viewed as alleviating harm from any possible overlap. In view of our ruling we need not consider that approach. Another more pertinent case is *United States v. Gaddis*, 424 U.S. 544, 547, 96 S.Ct. 1023, 1025, 47 L.Ed.2d 222 (1976), holding that a defendant cannot be convicted of both robbing a bank and receiving the loot. In *United States v. DiGeronimo*, 598 F.2d 746, 751 (2d Cir.), *cert. denied*, 444 U.S. 886, 100 S.Ct. 180, 62 L.Ed.2d 117

---

6. 18 U.S.C. § 2312 provides:

Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

7. 18 U.S.C. § 2313 provides:

Whoever receives, possesses, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, which has crossed a State or United States boundary after being stolen, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

(1979), following the *Gaddis* lead, it was held that the defendant could not be convicted of both robbery under the Hobbs Act, 18 U.S.C. § 1951, and receiving the same goods stolen from the interstate shipment under 18 U.S.C. § 659.

Nor is multiplicity new to this court. In *United States v. Seals*, 545 F.2d 26, 29 (7th Cir.1976), we held that a defendant could not be convicted of both robbing a mail employee under 18 U.S.C. § 2114 and of possessing the same stolen mail under 18 U.S.C. § 1708. More recently we affirmed that view in *United States v. Moore*, 616 F.2d 1030 (7th Cir.), *cert. denied*, 446 U.S. 987, 100 S.Ct. 2972, 64 L.Ed.2d 844 (1980). Subsequently, in 1984 in *United States v. Martin*, 732 F.2d 591 (7th Cir.), we recognized that a defendant could not be convicted for both receiving a firearm in violation of 18 U.S.C. § 922(h), and possessing the same firearm in violation of 18 U.S.C.App. § 1202(a). We do not retreat from those holdings.

In defending the multiplicity argument the government, although recognizing that Spudic was charged with both crimes for the one personal act of changing the VIN on each vehicle, points out that the elements of the two crimes are different, and necessarily the evidence required for each is different. In *United States v. Meek*, 388 F.2d 936, 938 (7th Cir.), *cert. denied*, 391 U.S. 951, 88 S.Ct. 1855, 20 L.Ed.2d 866 (1968), Judge Swygert writing for the court affirmed that the defendant was guilty both of transporting a stolen vehicle in interstate commerce, a car he had initially rented, and of concealing the same car when he changed the license plates. Multiplicity does not appear to have been argued, and an effort might be made to distinguish *Meek* on the basis that the defendant personally did different things to violate the two sections involved; he actually drove the car interstate and, after getting back to Illinois from Florida, he took the license plates from the car of another and affixed them to his stolen vehicle. Spudic argues that his one act, however, of changing the VIN resulted in two convictions for the same thing. In a way it did, but there are other considerations.

18 U.S.C. § 2312 requires that the defendant unlawfully transport or cause to be transported in interstate or foreign commerce a stolen motor vehicle knowing the same to be stolen. On the other hand, the elements of 18 U.S.C. § 2313 are that the defendant receive, conceal, store, barter, sell, or dispose of a stolen motor vehicle, which has crossed a State or United States boundary, knowing the same to have been stolen. The difference is easily recognized between transporting a stolen vehicle in interstate commerce and concealing it. These two are separate crimes with elements which are not entirely identical. The test is set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932):

> The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.

Under this test, Spudic's multiplicity argument fails.

Moreover, Spudic forgets not only that what he did contributed to the stolen vehicle merchandising business, but that he had considerable conspiratorial help for which he shares responsibility. *Pinkerton*, 328 U.S. at 646–47, 66 S.Ct. at 1183–84. John Salazar, a farsighted coconspirator, anticipating that the 1978 Ford van involved in these counts would be stolen for disposition later to Jose Garza in Chicago, purchased an older van in order to be prepared. This van purchase assisted in arranging the necessary, but fictitious paper work, and affixing a substitute VIN on the newer stolen van. Garcia testified about a discussion he heard between the conspiratorial executives. The substance was that Spudic should go to where the stolen 1978 Ford van was temporarily stored, change the keys and install the substitute VIN tag. The Ford van, after those changes had

been accomplished, was recovered from Garza in Chicago.

Once this Ford van had been stolen and the paper work begun for an out-of-state customer the van had actually begun its interstate journey even though it had not yet crossed a state line. The new fictitious VIN facilitated both a safe interstate journey and the subsequent concealment of the vehicle from its legitimate owners. In this instance no one actually witnessed Spudic make his particular contribution, but considering all the facts and circumstances in evidence the jury could rely on the directions given by the Salazars, the principal coconspirators, to have Spudic do the job, and that it did get done. The evidence was sufficient to show that Spudic contributed to the conspiracy by helping to facilitate the sale and the collection of the sale proceeds. Otherwise, the enterprise would have experienced an unrewarding cash flow problem. The same view is taken of similar charges against Spudic for causing the interstate transportation and concealment of a 1977 Ford pickup truck which also moved through the enterprise "assembly line" from Indiana to Chicago.[8]

### SENTENCING PROCEDURE

A rather unique preliminary sentencing procedure is utilized by Judge Moody. In imposing sentence on a codefendant in a separate proceeding Judge Moody explained the process in these excerpts:

\* \* \* \* \* \*

You are entitled to know basically how the Court arrives at a proper sentence within the maximums that are prescribed by the law. A very substantial and detailed pre-sentence investigation report is prepared for me by a duly qualified United States Probation Officer, and I study that report.

After I have studied the report and I meet with what we call a sentencing council, and the sentencing council consists of at least one (1) experienced supervising probation officer.... [S]o far

we have had maybe six (6) other probation officers, I would say about six (6) other probation officers that meet in our part of that sentencing council.

We meet, we go into depth as to a discussion of the contents of that presentence report. The circumstances of the offenses that have been charged in this case, and then at the time of sentencing, I hear anything that you or your attorney ... want this Court to consider.

And I would also hear whatever the government would say in aggravation or mitigation. If they say anything, they may say nothing, but I would also consider that.

\* \* \* \* \* \*

... [T]hey submit to me the pre-sentence report much in advance before I meet with the sentencing council, giving me the opportunity to study it without them, so I can be prepared to discuss it with them at the sentencing council.

There is no doubt that sentencing is a critical stage of the proceedings at which the defendant is entitled to be present with his counsel. *Mempa v. Rhay*, 389 U.S. 128, 134, 88 S.Ct. 254, 256, 19 L.Ed.2d 336 (1967). Although we recognize limits upon appellate review of the length of sentences, we do have a duty to insure " 'that rudimentary notions of fairness are observed in the process at which sentence is determined.' " *United States v. Huff*, 512 F.2d 66, 71 (5th Cir.1975) (quoting *United States v. Espinoza*, 481 F.2d 553, 558 (5th Cir. 1973)). As we recently noted, Fed.R. Crim.P. 32 has regulated and improved this sentencing process. *United States v. Sosa*, 789 F.2d 1257, 1261–64 (7th Cir.1986).

Spudic, joined by Ochoa, challenges the sentencing process on the basis that their constitutional rights have been violated "by the judge holding a secret Sentencing Council outside the presence of the defendants." This charge concerns us, even though probation officers are members of the court's staff, as it has implications that directly reflect on the fairness of the sen-

---

**8.** We need not consider the concurrent sentence effect on multiplicitous counts as we find the counts not to be multiplicitous.

tencing process. Neither a defendant nor his attorney are permitted to be present at the sentencing council, nor are they informed about what may have happened at the meeting. There could be legitimate concern, for instance, that one of the probation officers, not the one who prepared the presentence report, may have contributed some additional pertinent adverse information about the defendant. That would leave the defendant without the Rule 32 opportunity to challenge it since the judge at sentencing may not reveal the things taken into consideration in arriving at the sentence. Therefore, if new information should be developed in the sentencing council it must, in any event, cause an amendment of the written report. The *ex parte* conferring of the sentencing judge with his particular probation officer, the one responsible for the preparation of the presentence report, is not challenged. At other times and places that issue has been considered and approved, although some judges prefer that it all be on the record in open court. *See United States v. Houston,* 745 F.2d 333, 334 (5th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1369, 84 L.Ed.2d 388 (1985); *United States v. Davis,* 527 F.2d 1110, 1112 (9th Cir.1975), *cert. denied,* 425 U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 196 (1976). The presence of the United States Attorney, however, along with the probation officer in *ex parte* conference with the judge has understandably not been sanctioned anywhere. *United States v. Hone,* 456 F.2d 495, 497 (6th Cir.1972).

■ There could likewise be some additional concerns. The sentencing council may have an unrecognized influence on the sentencing judge causing the judge to abide by the council consensus. That could lead to the further concern that the impact

of what is subsequently presented in open court at sentencing will be minimized, that the sentence will be largely foreordained, and that the judge therefore enters the actual sentencing hearing without an open mind. *See Davis,* 527 F.2d at 1112. Rule 32 is not to be complied with merely "in form." *United States v. Serhant,* 740 F.2d 548, 554 (7th Cir.1984). *Accord United States v. Sparrow,* 673 F.2d 862, 865 (5th Cir.1982). Nor should the rule be reduced to a "meaningless formality." *United States v. Long,* 656 F.2d 1162, 1165 (5th Cir.1981).[9] After the deliberations of the sentencing council the sentencing judge has yet to hear from the government, defendant and his counsel in conformity with Rule 32, and to weigh whatever evidence may be offered. The usefulness of that open court hearing cannot be preempted in fact or in appearance by the prior deliberations of the sentencing council.

Having mentioned a few of the negative possibilities arising from the use of a probation officer sentencing council, we do not intend to imply that Judge Moody was guilty of any of the possible abuses, or that anyone except him in the exercise of his own sound judicial discretion, after compliance with Rule 32, concluded what the appropriate sentences should be, and then imposed them. We realize that use was made of the experience of the probation officers in a conscientious effort to determine appropriate and fair sentences not disproportionate from other sentences in like cases.

■ Nevertheless, on balance, we are concerned with the institutionalized use of this sentencing council procedure because of the concern and doubts which it can understandably foster in the minds of defendants, their counsel, and the public.

---

**9.** In *United States v. Niemiec,* 611 F.2d 1207 (7th Cir.1980), this court made mention of the use of a sentencing council in this same district in connection with sentencing by a successor judge because of the intervening serious illness of the trial judge. The propriety of the use of a sentencing council, likely composed of probation officers as in the present case, was not directly raised. *Id.* at 1212.

The use of a sentencing council composed only of judges is not an issue, but these related

citations may be of interest: *United States v. Gonzales,* 765 F.2d 1393 (9th Cir.1985); *United States v. Driscoll,* 496 F.2d 252 (2d Cir.1974); Parsons, Aids in Sentencing, 35 F.R.D. 423 (1964); Zavatt, Sentencing Procedure in the U.S. District Court for the Eastern District of New York, 54 F.R.D. 327 (1968); Levin, Toward a More Enlightened Sentencing Procedure, 45 Neb.L.Rev. 499 (1966).

The judge should not have to defend or explain what the *ex parte* sentencing council did or did not do, nor should any of the parties have to accept the sentencing council deliberations on faith. Because of the potential for abuse, its doubtful appearance, and the possible misunderstanding of the *ex parte* process, we cannot sanction the use of the probation officer sentencing council concept, regardless of its supposed benefits. There should be even less justification for its use in the future under the provisions of the Sentencing Reform Act of 1984,[10] and the guidelines of the United States Sentencing Commission.[11]

Affirmed, except for the convictions of Ochoa and Spudic for mail fraud, counts 24 through 27, which are reversed. Spudic requests that if the conviction on any count is affirmed that the case be remanded for resentencing. That request in these circumstances is justified as to both defendants. The sentences of both Ochoa and Spudic are vacated and the case is remanded for resentencing. Circuit Rule 18 shall apply.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

10. *See* 18 U.S.C. § 3551 *et seq.*

11. *See* 28 U.S.C. § 991 *et seq.*