**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　　*Plaintiff-Appellee,*

v.

CLEBURNE JR BRIGHAM,
　　　　　　　*Defendant-Appellant.*

No. 03-30381

D.C. No.
CR-02-00220-ALH

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, District Judge, Presiding

Argued and Submitted
November 2, 2004—Portland, Oregon

Filed May 5, 2006

Before: Warren J. Ferguson, Stephen S. Trott, and
Andrew J. Kleinfeld, Circuit Judges.

Opinion by Judge Kleinfeld;
Concurrence by Judge Ferguson

## COUNSEL

Brian Peterson (argued) and Jeffrey Schwartz, Attorneys at Law, San Francisco, California, for Defendant-Appellant Cleburne JR Brigham.

Michael K. Atkinson (argued), United States Department of Justice, Criminal Division, Fraud Section, Washington, D.C., and Karen J. Immergut, and Allan M. Garten, Office of the United States Attorney, District of Oregon, for Plaintiff-Appellee United States of America.

## OPINION

KLEINFELD, Circuit Judge:

This is a sentence appeal. We affirm because Brigham did not object to the claimed errors and because the errors do not qualify as "plain."

## I.

## FACTS

Brigham and others bought a successful restaurant in Portland. He looted it, and it failed. He also applied for a number of loans totaling more than $1 million dollars, lied on his loan applications, and got some of them. Hundreds of thousands of dollars went into the restaurant and out to Brigham for various improper purposes, including $88,520 for vehicle expenses and $162,342 for personal expenses. Brigham even delayed turning over tips to the restaurant employees for weeks after they had earned them. Eventually, the restaurant went into bankruptcy and the United States Trustee discovered what had been going on.

Brigham's indictment included three counts of making false statements on a loan application,[1] one count of making false statements to the Small Business Administration,[2] and two counts of misusing a Social Security number.[3] He had lied in his loan applications about what his Social Security number was, whether he had ever been charged with a crime, whether he had been involved in bankruptcies, and what his liabilities were. The loan applications in the indictment added up to $1,232,570. The presentence report says he was refused a $697,000 loan, but that he and his associates got $168,995

---

[1]18 U.S.C. § 1014.

[2]18 U.S.C. § 1001.

[3]42 U.S.C. § 408(a)(7)(B).

to purchase and $30,000 to capitalize the restaurant, then another $169,500 for the restaurant, and then Brigham got $196,875 to buy a house. He and his associates pledged stock to get the $168,995 loan. The lenders got some payments, but wound up losing $308,732 on the fraudulently obtained loans.

He entered into a plea agreement and pleaded guilty to a six count indictment, largely in return for the three-point early acceptance of responsibility deduction[4] and the government's agreement not to charge his wife. Brigham's sentence was higher than he or the government expected — 37 months instead of 24 months — because his criminal history turned out to be at level III instead of level I on the guidelines table.[5] Brigham had previously been jailed for 60 days for criminal contempt in state court. The contempt was for violating an injunction against selling securities and was imposed after Brigham fraudulently sold unregistered securities. He was still on probation for that offense when he misused a Social Security number in his indictment on the $196,875 loan application. His total sentence in this case was 37 months in custody, 5 years of supervised release, $308,732 in restitution, and $600 in special assessments.

## II.

## ANALYSIS

Brigham appeals the district judge's participation in a "sentencing council," use of the pledged stock to generate a two point upward adjustment for violating a court order, and the sentencing judge's calculation of the loss.

---

[4]*See* U.S.S.G. § 3E1.1 (1997).

[5]*See* U.S.S.G. § 4A1.1 (1997); *see also* Sentencing Table, U.S.S.G. Ch. 5, Pt. A (1997).

## A.  The Sentencing Council

Oregon has a procedure — unusual to us but evidently long established there — of regular sentencing council meetings for the district judges. According to a 1981 Federal Judicial Center study, sentencing councils of this sort were a reform implemented in four districts, intended to reduce sentencing disparity in that pre-guidelines period.[6] But the study's findings showed that the councils increased disparity in about as many categories as they reduced it, and mostly did not affect disparity at all.[7]

Evidently sentencing councils are still used, or at least were when Brigham was sentenced. They were no secret. At Brigham's sentencing hearing, the judge referred to the discussions that he had participated in regarding Brigham's case at the sentencing council. For example, when Brigham's lawyer made a point regarding calculation of loss, the district judge described the discussion he had participated in at the sentencing council regarding the cases that bore on the issue:

> Well, I appreciate that. And this matter was discussed at sentencing council this morning, and it would appear to a number of us that the case cited by Mr. Ungar, the *Shaw* case, would lead one to this finding and not the *McCormick* case that the government relies upon, and it only slightly changes the ultimate sentencing range. And, in fact, it probably did not end up making a substantial difference in the actual sentence that the court imposes.

Brigham did not object to the judge's participation in the sentencing council before the sentencing, nor did he object during sentencing, even after the judge expressly described

---

[6]*See The Effects of Sentencing Councils on Sentencing Disparity* at v, (Federal Judicial Center 1981).

[7]*See id.* at 1.

the council's participation in his case. It was only after Brigham had been sentenced to a disappointing 37 months that he raised any issue regarding the sentencing council. During a motion for release pending appeal, Brigham argued that his appeal was likely to succeed because the sentencing judge had participated in a sentencing council. The judge expressed his concern that Brigham had not previously objected and described how the Oregon sentencing council works:

> Well, as noted by the government at the time of the sentencing, there was no objection to the fact that this district still has what we still call a sentencing council. And, had there been objection, the court could easily have called witnesses to detail exactly how the sentencing council operates. It's just a matter of having the benefit of other judicial interpretations of the sentencing guidelines that aids the sentencing court insofar as the appropriate sentence.
>
> Sentencing council recommendations are not binding upon the sentencing judge in any respect, and oftentimes I've read the newspaper following a sentencing council and said gees, did we discuss that case or not, because the sentencing judge has total discretion to totally ignore or follow the recommendations. It just depends on what he or she believes is the appropriate sentence to impose. Oftentimes the guidelines issues are such that other judges over the course of their experience have dealt with that particular guideline before and could give a newer judge assistance in making the appropriate disposition.

On appeal, Brigham argues that the sentencing council is a prohibited *ex parte* communication and that its use amounts to plain error under a Seventh Circuit case, *United States v. Spudic*.[8]

---

[8] *United States v. Spudic*, 795 F.2d 1334 (7th Cir. 1986).

None of the authorities discussed by Brigham or by the concurrence establish whether it is error to use the sort of sentencing councils used in Oregon. The same phrase, "sentencing council," meant something altogether different in *Spudic*. There, it was a meeting of the judge with "a number of probation officers,"[9] and the Seventh Circuit disapproved of the practice.[10] Some of the reasons the *Spudic* court disapproved of the sentencing council in that case would be relevant to the Oregon sentencing council. *Spudic* says that the sentencing judge might be tempted to abide by the institutional consensus rather than his own judgment, and that the impact of the in-court presentations might be unduly minimized.[11] But other reasons undergirding *Spudic* are irrelevant, such as a concern that a probation officer who did not prepare the presentence report might tell the judge something adverse about the defendant that the defendant would never get a chance to challenge.[12] Probation officers do not participate in the Oregon sentencing council. *Spudic* does not even establish that a sentencing council consisting of district judges would be error in the Seventh Circuit. It is true that the views of other judges might carry more weight than those of probation officers. On the other hand, a judge might have a concern with staff morale if he disregarded the views of a large group of probation officers, but not if he disregarded the views of other judges.

[1] The Fourth Circuit held in *United States v. Johnson*[13] that an *ex parte* meeting of the sentencing judge with the two probation officers who prepared the presentence report was unobjectionable. We have also had some related cases. In *United States v. Davis*, we held that it was "entirely proper" for a judge to discuss the presentence report and sentence with

---

[9]*Id.* at 1336.

[10]*See id.* at 1343-44.

[11]*See id.* at 1343.

[12]*See id.*

[13]*United States v. Johnson*, 935 F.2d 47, 51-52 (4th Cir. 1991).

the probation officer who prepared the report outside the defendant's presence.[14] In *United States v. Gonzales*, the most relevant of the cases cited by the parties, the defendant brought a Due Process challenge against the use of the Oregon sentencing council and a discussion between the sentencing judge and the probation officer who prepared the presentence report.[15] The defendant in *Gonzales* sought an evidentiary hearing to find out what was said about his case at the sentencing council and what was said between the judge and the probation officer.[16] We held that the defendant was not entitled to the evidentiary hearing and accepted the sentencing judge's record statement that the probation officer had disclosed no new facts to him in the *ex parte* conversation.[17]

[2] In the face of these authorities, there is no way that the use of a sentencing council could fairly be called "plain error," regardless of whether its use is error. Plain error is "(1) error, (2) that is plain, and (3) that affects substantial rights."[18] For error to qualify as "plain," it must be "so clear-cut, so obvious, [that] a competent district judge should be able to avoid it without benefit of objection."[19] If an error is not "clear" or "obvious" from the record, the defendant's failure to object is fatal.[20] Brigham's failure to object is important because, if he had objected, the sentencing judge could have developed a record as he explained in the post sentencing discussion. Or the sentencing judge could have decided not to participate in a sentencing council in Brigham's case. Or he could have reconsidered the sentence without regard to what

---

[14]*United States v. Davis*, 527 F.2d 1110, 1112 (9th Cir. 1975).

[15]*United States v. Gonzales*, 765 F.2d 1393, 1396 (9th Cir. 1985).

[16]*See id*. at 1398.

[17]*See id*. at 1396.

[18]*United States v. Cotton*, 535 U.S. 625, 631 (2002); *see also United States v. Ameline*, 409 F.3d 1073, 1078 (9th Cir. 2005) (en banc).

[19]*United States v. Smith*, 424 F.3d 992, 1002 (9th Cir. 2005).

[20]*United States v. Olano*, 507 U.S. 725, 734 (1993).

the other judges had said at the council. A canny defendant facing a tough sentencing judge might purposely withhold objections for tactical reasons in the hope that the sentencing council would hold the harsh judge down, saving his objection for later in case the sentencing turned out worse than expected.

[3] None of the cases we have been directed to suggests that using a sentencing council like the one used in this case is error. Because the error in using the Oregon sentencing council was not "plain," we do not have occasion in this case to decide whether it was error at all. This is where we part ways with Judge Ferguson's concurrence. We do not hold that the Oregon sentencing council procedure is error, and we do not hold that it is not error. We only hold that it is not "plain" error.

## B.   The Pledge of Stock and Calculation of Loss

[4] Brigham next argues that the district court erred in finding that Brigham violated a judicial order and imposing the consequent two-level enhancement under Sentencing Guidelines § 2F1.1(b)(3)(B).[21] He claims that the order he violated only prohibited "selling or offering to sell" stocks, not pledging them as collateral. The state court injunction he was held in criminal contempt for violating prohibited him from directly or indirectly selling or offering to sell any security in Oregon. The evidence at sentencing demonstrated that he directed another to pledge stock as collateral and argues that pledging stock as collateral does not amount to "selling or offering to sell." We have rejected the argument that pledging stock is not a sale. Following the Supreme Court's decision in *Rubin v. United States*,[22] we held that a pledge of stock is a sale in *United States v. Kendrick*.[23]

---

[21]*See* U.S.S.G. § 2F1.1(b)(3)(B) (1997).

[22]*See Rubin v. United States*, 449 U.S. 424, 431 (1981) (Holding that a pledge of stock is an offer or sale).

[23]*See United States v. Kendrick*, 692 F.2d 1262, 1265 (9th Cir. 1982) (Pledge of stock is a sale).

**[5]** Brigham also argues that there was not enough evidence for the district court's calculation of the amount of loss. The calculation of loss relied heavily on the probation officer's analysis in the presentence report and the United States Trustee's report, a seven page, single-spaced, detailed analysis accompanied by 13 pages of attachments. These documents are sufficiently detailed to provide an ample basis for the calculation the district court made. Brigham has identified no particular error, but argues that he "would need to comb through hundreds of boxes of documents in order to refute it." He does not claim lack of access to the documents, by which he evidently means the records from his own restaurant. Rather, he is not inclined to search them in the hope that an error might be found. Neither are we.

**[6]** We **AFFIRM**, except that we grant a limited **REMAND** to allow the district court to answer the question whether it would have imposed a different sentence had the Guidelines been viewed as advisory.[24]

---

FERGUSON, Circuit Judge, concurring in the judgment:

I concur in the majority's remand in light of *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc). I write separately, however, to disagree with the majority's acceptance of the use of a sentencing council in determining Brigham's sentence. Brigham entered into a plea agreement with the Government for a sentence of twenty-four months. After meeting with a sentencing council, the District Judge increased Brigham's sentence to thirty-seven months. Neither Brigham nor the public will ever know what impact the council had on Brigham's increased sentence because neither party in the case was allowed to attend the sentencing council meet-

---

[24]*See United States v. Ameline*, 409 F.3d 1073, 1079 (9th Cir. 2005) (en banc).

ing, and a record of the exchange was not disclosed. Brigham's mere knowledge that a sentencing council was used in his case does not remedy this harm.

The majority underestimates the "potential for abuse," the "doubtful appearance, and the possible misunderstanding" of sentencing council proceedings that take place outside the defendant's presence. *United States v. Spudic*, 795 F.2d 1334, 1344 (7th Cir. 1986). In *Spudic*, for example, the Seventh Circuit held that, while a judge may confer with his particular probation officer, the use of a sentencing council made up of several probation officers could not be sanctioned regardless of its supposed benefits. *Id.* Even though *Spudic* dealt with a sentencing council made up of probation officers, and this case deals with a sentencing council consisting of judges, the same principle prohibiting ex parte communications between the sentencing judge and outside parties applies to either form of sentencing council. *See id.* at 1343-44 (describing probation officer sentencing council as an ex parte conference). Canon 3 of the Judicial Code of Conduct, which dictates protocol for federal judges, explicitly requires that a bench officer "neither initiate [n]or consider ex parte or other communications concerning a pending or impending proceeding." *See* Fed. R. Decisions, Canon 3(4). When a judge relies on secret discussions with other judges to make a decision in *his* case, the judge necessarily initiates ex parte communications.

In this case, the Government contends that Brigham was not harmed by these ex parte communications because the District Judge only discussed case law that was favorable to the defendant with the council. Even if that is true, "we are concerned with the institutionalized use of this sentencing council procedure because of the concern and doubts which it can understandably foster in the minds of defendants, their counsel, and the public." *Spudic*, 795 F.2d at 1343. Because the council meets ex parte, the full extent of any possible harm caused by the sentencing council will never be known

by either party unless the District Court chooses to disclose it. Faith in the integrity of sentencing judges leads me to agree that a judge should normally not need to defend or explain every element he relies on in his sentencing decision. *See id.* at 1344. Such integrity, however, must be bolstered by transparent procedural safeguards, such as public hearings that do not require the parties and the public "to accept the sentencing council deliberations on faith." *Id.* Secret sentencing councils, rather than being justified by a judge's integrity, may call it into question. This *is* the harm caused by ex parte communications.

The majority notes that *United States v. Gonzales*, 765 F.2d 1393, 1398-99 (9th Cir. 1985), does not disapprove of Oregon's sentencing councils. However, *Gonzales* also does not expressly approve of such councils; this Court's analysis was directed at whether communications between the sentencing judge and the probation officer during the sentencing process were improper. *Id.* (rejecting defendant's claim that probation officer acted improperly by engaging in "ex parte advocacy"). This Court previously established in *United States v. Davis*, 527 F.2d 1110, 1112 (9th Cir. 1975), *cert. denied*, 425 U.S. 953 (1976), that a judge can discuss the presentence report and sentence with the probation officer outside the defendant's presence. *Gonzalez* adopted the *Davis* holding. 765 F.2d at 1398. This Court has not yet directed its analysis at sentencing councils, such as Brigham's, that are comprised exclusively of judges. Yet, the reasoning of *Spudic* demonstrates use of such a council, consisting of either probation officers or judges, is an error.

In addition to constituting a troubling ex parte communication, the use of a sentencing council erodes the well-established principle that federal judges should be independent and insulated from group pressures. Article III of the Constitution provides life tenure and undiminished due compensation to federal judges to preserve their autonomy.

Indeed, early constitutional debates in this country underscore the importance of judicial independence and insulation:

> [The] independence of . . . judges is equally requisite to guard the Constitution and the rights of individuals from the effects of those ill humors, which . . . the influence of particular conjunctures . . . sometimes disseminate among the people themselves, and . . . have a tendency, in the meantime, to occasion dangerous innovations in the government, and serious oppressions of the minor party in the community.

The Federalist No. 78 (Alexander Hamilton). Sentencing councils require judges to be privately inter-dependent, which makes the judicial process dangerously susceptible to improper communal pressure.

A judge, of course, is not prohibited from consulting other judges. *See* FED. R. DECISIONS, CANON 3(4) Commentary. But when proceedings are carried out in secret, it is not possible to determine whether a decision was the result of permissible consultation or impermissible pressure. One of the original purposes of sentencing councils was to reduce sentencing disparity by placing "group pressure [on judges] to conform." FEDERAL JUDICIAL CENTER, THE EFFECTS OF SENTENCING COUNCILS ON SENTENCING DISPARITY 1 (1981). In *Spudic*, the Seventh Circuit described this potential for group pressure and misunderstanding:

> The sentencing council may have an *unrecognized influence* on the sentencing judge causing the judge to abide by the council consensus. That could lead to the further concern that the impact of what is subsequently presented in open court at sentencing will be minimized, that the sentence will be largely foreordained, and that the judge therefore enters the actual sentencing hearing without an open mind.

795 F.2d at 1343 (emphasis added). Because the sentencing council met in secret and may have had "an unrecognized influence on the sentencing judge," it is not possible to know if the increase in Brigham's sentence was the result of impermissible group pressure. *Id.* We lack basic proof—a record.

The fact that the sentencing council in *Spudic* consisted of probation officers and Brigham's council consisted of judges makes little difference to this analysis. The peer pressure exerted by fellow judges, with whom the sentencing judge must interact on a regular basis both formally and informally, is likely to have a greater impact than any concern for the staff morale of probation officers. Judges are also just as likely to share "additional pertinent adverse information about the defendant" with the sentencing judge as are probation officers who did not participate in the preparation of the presentence report. *See id.* Therefore, a sentencing council consisting of judges, as opposed to probation officers, is as much if not more damaging to the interest of the defendant in being sentenced in an individualized, transparent manner.

Apart from the injustice that results from ex parte communications, sentencing councils should be abolished because they are unnecessary. To the extent that the Sentencing Guidelines still play a role in a judge's determination of a sentence, sentencing councils frustrate any transparency provided by the advisory use of the Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 259 (2005) (finding that "[w]ithout the 'mandatory' provision, the [Sentencing Reform Act] nonetheless requires judges to take account of the Guidelines together with other sentencing goals"). The Sentencing Reform Act of 1984 and the United States Sentencing Commission both operate to reduce sentencing disparities, supplanting the original purpose of sentencing councils. S. REP. NO. 98-225, at 52 (1983), *reprinted in* U.S.C.C.A.N. 3182, 3236 (explaining how a primary goal of sentencing reform is the elimination of unwarranted sentencing disparity). In fact, when Congress created the Sentencing Guide-

lines, only presentence reports, not sentencing councils, were meant to supplement the Guidelines. *Id.* at 53. Congress's ultimate goal was to allow "each participant in the system . . . [knowledge as to] what purpose [was being] achieved by the sentence in each . . . case." *Id.* at 59. Each time a secret sentencing council convenes to assist a judge in rendering a decision, this goal is frustrated.

The use of sentencing councils is even more troubling in light of the new, advisory nature of the Sentencing Guidelines. *Booker*, 543 U.S. at 226. Judges now have greater discretion to impose sentences based on specific facts not enumerated in the Guidelines. What now protects a defendant from having outside, undisclosed information influence the deliberations of the council and, subsequently, the judge's discretionary sentence?

Sentencing councils promulgate decisions that are susceptible to impermissible group pressure. An informed judge, when conducting sentencing, need only use the Sentencing Guidelines, the presentence report, and arguments and evidence produced in open court to arrive at a decision grounded in law. We should no longer tolerate these secret ex parte proceedings.