945 F.2d 1387
 UNITED STATES of America, Plaintiff-Appellee,
v.
Jackie EDWARDS, Leda Martin, Olanrewaju Raji, Andre Stover,
Jimmy Lee Coleman, C.C. Hampton, Marlowe Cole,
Eric L. Bennett, Reggie Griffin, and
Ronald McMillen, Defendants-Appellants.
 Nos. 89-2880, 89-2890 to 89-2892, 89-2952, 89-2953, 89-3101,
89-3519, 90-1869 and 90-2117.
 United States Court of Appeals,
Seventh Circuit.
 Argued April 2, 1991.
Decided Oct. 15, 1991.
 
 Sean B. Martin (argued), Barry R. Elden, Vilija Bilaisis, Asst. U.S. Attys., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for U.S.
 Robert F. Nemzin (argued), Anita Rivkin-Carothers, Chicago, Ill., for Jackie Edwards.
 William H. Theis (argued), Chicago, Ill., for Leda Martin.
 Bruce H. Bornstein (argued), Freedman & Bornstein, Chicago, Ill., for Olanrewaju Raji.
 Robert A. Korenkiewicz (argued), Chicago, Ill., for Andre Stover.
 Carl P. Clavelli, Chicago, Ill., for Jimmy L. Coleman.
 Nathan Diamond-Falk (argued), Chicago, Ill., for C.C. Hampton.
 Julie L. Friedman (argued), Chicago, Ill., for Marlowe Cole.
 Richard T. Sikes (argued), Chicago, Ill., for Eric L. Bennett.
 Michael D. Gerstein (argued), Chicago, Ill., for Ronald K. McMillen.
 William J. Stevens (argued), Chicago, Ill., for Reggie Griffin.
 Before CUMMINGS and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 CUMMINGS, Circuit Judge.
 
 
 1
 For three years from 1986 through December 1988, Marlowe Cole presided over the "IBM" of heroin distribution systems on the south side of Chicago. Drug enforcement agents investigated the operation, and the United States convened a Special Grand Jury in April 1987 to review evidence obtained primarily through an extensive compilation of authorized wiretapped telephone conversations. The Grand Jury returned a 132-count indictment on December 1, 1988, charging eighteen individuals with participation in a three-year heroin distribution conspiracy run by Cole. For their involvement in the Cole heroin network, as it became known, the defendants were charged with conspiracy for their various roles under 21 U.S.C. § 846, for distribution in excess of one kilogram of heroin in violation of 21 U.S.C. § 841(a)(1), and with use of the telephone to commit a drug offense in violation of 21 U.S.C. § 843(b). Ten of the original Cole organization defendants appeal various aspects of their case to this Court.
 
 
 2
 Of the ten defendants whose appeal is now before us, six were tried jointly before Judge Bua in the spring of 1989. They were Jackie Edwards, Leda Martin, Olanrewaju Raji, Andre Stover, Jimmy Lee Coleman, and C.C. Hampton. After an eleven-day trial, the jury deliberated for three and one-half days and found all six guilty. Although defendant Eric L. Bennett's role in the Cole organization was discussed at the joint trial, he was a fugitive at the time of trial. He was apprehended and tried and convicted separately in August 1989 in a bench trial before Judge Bua. Three other defendants pleaded guilty. Marlowe Cole, the organization's "CEO," admitted to operating a continuing criminal enterprise in violation of 21 U.S.C. § 848 and to money laundering in violation of 18 U.S.C. § 1956. Judge Bua sentenced him to a prison term of 30 years. Ronald McMillen also entered into a plea, admitting his liability for conspiracy to distribute in excess of one kilogram of heroin in violation of 21 U.S.C. § 846. Judge Bua sentenced him to 121 months' imprisonment. Lastly, Reggie Griffin, like Bennett, was a fugitive at the time of the joint trial. After he was apprehended, Griffin pleaded guilty to the conspiracy count of the indictment. He received a prison term of 83 months.
 
 
 3
 The six defendants who went to trial also received prison sentences, all of which were imposed by Judge Bua pursuant to the Sentencing Guidelines. Based both on their respective roles in the Cole heroin conspiracy and the various adjustments to their sentences, the defendants received a variety of prison sentences. Jackie Edwards received a sentence of 30 years. Leda Martin received a sentence of seventeen years and six months. Olanrewaju Raji received a sentence of 188 months. The trial court sentenced Stover to imprisonment for a term of 20 years. Jimmy Lee Coleman ultimately received a prison term of 20 years. Defendant C.C. Hampton received a sentence of 262 months. Finally, Eric L. Bennett, after his separate trial, was sentenced to a prison term of 25 years.
 
 
 4
 Defendants have presented a compendium of claims, most of which lack merit and which we will not address directly in the discussion below. We affirm the conspiracy convictions of each defendant. However, based upon a careful review of the record and the defendants' arguments, we conclude that the Sentencing Guidelines were incorrectly applied in this case. The conduct for which a defendant can be sentenced under the Guidelines is limited to that conduct which is reasonably foreseeable. In interpreting the Guidelines language for sentencing co-conspirators, we look for guidance to substantive conspiracy law since the Guidelines language approximates the substantive standard. An examination of the relevant cases reveals that a critical factor in determining the proper sentence is the degree of any given defendant's involvement in the conspiracy. As to certain defendants, we conclude that the scope of the Cole heroin conspiracy for the purposes of sentencing is narrower than viewed by the trial judge. Therefore, we remand for resentencing such defendants under the version of the Guidelines in force at the time of sentencing.
 
 I. FACTS
 
 5
 The Marlowe Cole heroin conspiracy was a sophisticated retail business. It was well organized, tightly knit, carefully managed, and highly profitable. Cole stood at the head of the organization, and was assisted in the running of the operation by his live-in girlfriend, Deborah Cain. They oversaw the daily operation of the business and engaged the services of the suppliers, distributors, and drug couriers. They also diluted the heroin from its wholesale strength, dividing it into user-sized plastic packages, sending the product to be sold on the south side of Chicago. Working under Marlowe Cole were the organization's mid-level managers, C.C. Hampton, Leda Martin, and Jimmy Lee Coleman. These intermediaries stored and inventoried the packages of heroin and oversaw the operation of the business on the street, enforcing Cole's strict business regulations. They distributed the product to the street dealers, who in turn returned the proceeds of sale to the mid-level managers.
 
 
 6
 Eric Bennett and Ronald McMillen were among those street vendors who received the heroin from the mid-level managers. They hawked heroin in the streets and from a barren apartment called the "workhouse."
 
 
 7
 At the other end of the organizational spectrum were the wholesalers who procured heroin for sale by Cole and his underlings. Olanrewaju Raji, Andre Stover, Reggie Griffin, and Jackie Edwards provided the business with a supply of large, wholesale quantities of heroin. With this distribution apparatus in place, the Cole organization operated seven days a week, selling, bartering and extending credit to those trading for or buying the one and only commodity--heroin.
 
 
 8
 This portrait of the Cole organization emerged from the extensive evidence compiled, including the phone calls between co-conspirators, recorded during a two-month-long wiretap during which federal agents, with court approval, taped approximately 6,000 telephone conversations. Additionally, two insiders, Ontario and Haussian Evans (who were nephews of Cole), provided live testimony on the Government's behalf. The Evans brothers delivered heroin for their Uncle Marlowe. Drug enforcement agents who made undercover purchases of heroin from the Cole organization also testified in court. Finally, the Government introduced documentary evidence, including tax records, phone records, financial documents, and other physical evidence.
 
 II. ANALYSIS
 A. Application of the Sentencing Guidelines
 
 9
 The appeals in this case arise in part over the proper application of the Sentencing Guidelines in determining the base offense level assigned by the district court to each defendant. The base offense level corresponds to the quantity of drugs involved in the offense. Sentencing Guidelines § 2D1.1. The sentencing judge refers to the Drug Quantity Table, § 2D1.1(c), and chooses the base offense level that matches the amount of the specific controlled substance (or substances) involved. The base offense level, in turn, serves as a jumping-off point, for the judge selects a sentence that falls within the applicable guideline range for that level, and then adjusts the sentence accordingly for other factors, such as criminal history or acceptance of responsibility, and for other relevant details disclosed in the Presentence Investigation Report.
 
 
 10
 The Government and the defendants do not disagree over whether the Guidelines apply to the sentencing in this case. It is uncontroverted that a conspiracy that began before the Guidelines went into effect but continued after the Guidelines became law is within the scope of the Guidelines. Here the conspiracy with which the defendants were charged began in 1986 and continued through December 1988. The Guidelines initially went into effect on November 1, 1987. Therefore, they provide the legal framework for sentencing the members of the Cole organization. United States v. Osborne, 931 F.2d 1139, 1144 (7th Cir.1991); United States v. McKenzie, 922 F.2d 1323, 1328 (7th Cir.1991); United States v. Fazio, 914 F.2d 950, 959 (7th Cir.1990). However, all of the defendants save Eric Bennett, Reggie Griffin and Ronald McMillen were sentenced before November 1, 1989, the date on which certain substantive amendments to the Guidelines took effect. There have been additional amendments since then, effective November 1, 1990, but they are not discussed by the parties, nor are they relevant to this appeal. In sentencing the defendants, the district court applied the Guidelines that were in effect until November 1, 1989, and our review will be of the Guidelines as they existed before the 1989 amendments.
 
 
 11
 B. Interaction of Conspiracy Law and the Sentencing Guidelines
 
 
 12
 All of the defendants challenge the district judge's determination of the base offense level, claiming that they were improperly sentenced based upon the entire amount of heroin that was distributed during the Cole conspiracy. While the jury returned a guilty verdict against each defendant on the conspiracy count, the determination of the base offense level involves a separate inquiry that is made by the sentencing judge, for a general verdict does not establish with whom a defendant conspired or the quantity of drugs encompassed by the conspiracy.
 
 
 13
 Section 2D of the Guidelines governs the sentencing judge's determination of the base offense level for crimes involving drugs and drug conspiracies. Specifically, Guideline Section 2D1.4 mandates that the offense level "shall be the same as if the object of the conspiracy * * * had been completed." Elaborating the proper interpretation of Section 2D1.4 is Application Note 1, which places an important limitation on the sentence that can be imposed on any given co-conspirator. The relevant language of Application Note 1 in force at the time of the sentencing provided that:
 
 
 14
 [i]f the defendant is convicted of conspiracy, the sentence should be imposed only on the basis of the defendant's conduct or the conduct of co-conspirators in furtherance of the conspiracy that was known to the defendant or was reasonably foreseeable.
 
 
 15
 Application Note 1, § 2D1.4 (emphasis supplied).
 
 
 16
 Guideline Section 1B1.3(a)(1) is also relevant to our inquiry because it defines more generally the "conduct" that is to be considered in determining the sentence range. Relevant conduct, for purposes of the section, includes:
 
 
 17
 all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;
 
 
 18
 § 1B1.3(a)(1). The section is followed by commentary. Application Note 1 of the commentary restricts relevant conduct for a conspiracy to "conduct in furtherance of the conspiracy that was known to or was reasonably foreseeable by the defendant." Application Note 1 to Section 1B1.3.
 
 
 19
 The November 1, 1989, amendments to the Guidelines consolidated all of the language discussing reasonably foreseeable relevant conduct in Section 1B1.3. Under the amendments, Section 2D1.4 now directs the sentencing judge to Section 1B1.3 for discussion of conduct that is reasonably foreseeable for sentencing purposes. However, the main text of Section 1B1.3(a)(1) did not change, and the modification is contained in Application Note 1 to Section 1B1.3, which explains the parameters of reasonably foreseeable conduct more clearly than the earlier commentary:
 
 
 20
 In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant "would be otherwise accountable" also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant. Because a count may be broadly worded and include the conduct of many participants over a substantial period of time, the scope of the jointly-undertaken criminal activity and hence relevant conduct, is not necessarily the same for every participant. Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.
 
 
 21
 Application Note 1 to amended § 1B1.3. The amended commentary proceeds to multiple illustrations of conduct for which a defendant would be held accountable. Relevant to this case is Illustration e:
 
 
 22
 Defendants H and I engaged in an ongoing marihuana importation conspiracy in which Defendant J was hired only to help off-load a single shipment. Defendants H, I, and J are included in a single count charging conspiracy to import marihuana. For the purposes of determining the offense level under this guideline, Defendant J is accountable for the entire single shipment of marihuana he conspired to help import and any acts or omissions in furtherance of the importation that were reasonably foreseeable. He is not accountable for prior or subsequent shipments of marihuana imported by Defendant H or I if those acts were beyond the scope of, and not reasonably foreseeable in connection with, the criminal activity he agreed to jointly undertake with Defendants H and I (i.e., the importation of the single shipment of marihuana).
 
 
 23
 Illustration e to § 1B1.3. As the illustration makes clear, a defendant in a drug conspiracy will not be held accountable for prior or subsequent conduct that was not a reasonably foreseeable element of the criminal activity agreed to by the defendant, even if the conduct involved the distribution of the same controlled substance by other defendants. This example shows that the most relevant factor in determining the reasonable foreseeability of conduct engaged in by co-conspirators in an intricate and long-standing conspiracy is the scope of the defendant's agreement with the other conspirators.
 
 
 24
 Although the revised commentary clarifies the scope of relevant conduct for sentencing purposes, the language of the actual Guideline section did not change one iota as a result of the November 1, 1989, amendments. The commentary to Section 1B1.3 elaborates upon the meaning of identical language more extensively than the pre-amendments commentary. Even though the statute, not the commentary, has the force of law, the amended commentary informs (even if it does not direct) our analysis. As we have said previously, "[t]he Sentencing Commission's application notes are contemporaneous explanations of the Guidelines by their authors, entitled to substantial weight." United States v. White, 888 F.2d 490, 497 (1989), citing United States v. Pinto, 875 F.2d 143, 144 (7th Cir.1989). Because the amended commentary is more specific than the pre-amendment commentary in elucidating reasonably foreseeable conduct, it is mentioned here as a prelude to a discussion of conspiracy cases decided by this Court and other courts.
 
 
 25
 In determining the base offense level, the district judge may be guided by conspiracy law in considering which conduct is relevant for sentencing purposes. United States v. LaFraugh, 893 F.2d 314, 317 (11th Cir.1990), discussed the applicability of conspiracy law to determinations under the Guidelines, holding that "the standards embodied in [the Guidelines] roughly approximate those detailed by the Supreme Court" in Pinkerton v. United States, 328 U.S. 640, 646-647, 66 S.Ct. 1180, 1183-1184, 90 L.Ed. 1489. Pinkerton held that a defendant is responsible for the acts of his co-conspirators if those acts 1) were reasonably foreseeable to the defendant and 2) were in furtherance of the conspiracy. As applied, Pinkerton permits "a finding that a defendant * * * faces liability for the substantive crimes of the conspiracy," as well as "criminal liability for joining the conspiracy." United States v. Townsend, 924 F.2d 1385, 1388-1389 (7th Cir.1991).
 
 
 26
 As the language in both Pinkerton and the Guidelines indicates, there are two limiting factors on the use of conduct in calculating the sentence of a conspiracy defendant. The conduct must be 1) in furtherance of the conspiracy and 2) reasonably foreseeable to the defendant.
 
 
 27
 It is tempting in this case to characterize certain of the defendants as engaging in smaller, "stand-alone" conspiracies rather than one large, overall conspiracy. For example, defendants Raji, Stover, Griffin, Edwards and Bennett--the supplier-wholesalers--could be considered competitors rather than co-conspirators. As such, each might be considered to engage in a "mini-conspiracy" when he sells heroin to Cole's network, separate and distinct from a larger conspiracy involving all drugs supplied by all suppliers. Under this approach, the sentences of these defendants would be limited by the "in furtherance of the conspiracy" Pinkerton factor. Only the drugs that each supplier-defendant individually supplied would be considered in furtherance of his individual conspiracy.
 
 
 28
 There are several problems, however, with splitting the larger conspiracy into smaller stand-alone conspiracies in this case. On a practical level, the jury and judge below convicted the defendants of one conspiracy comprising an entire distribution network, running from suppliers through packagers all the way down to street vendors. This was the theory of the Government's prosecution. Indeed, the defendants have not argued that their individual agreements were narrower, and we hesitate to advance this theory in the absence of such arguments.
 
 
 29
 On a more theoretical level, there is good reason to leave the single conspiracy intact when analyzing an intricate and long-standing drug distribution network. To function effectively, a complex drug network must necessarily include reliable suppliers and street vendors--who typically compete with each other--as well as "executives and managers"--who typically cooperate with each other. Where competing suppliers maintain a long-standing business relationship with the network, it makes no sense to exclude them from the web of expanded drug conspiracy liability. These long-standing suppliers become as much a part of the conspiracy as the core managers, and thus should be sentenced on the basis of the entire quantity of drugs distributed by the network. In sum, the more important consideration is not whether a particular defendant can be labeled a competitor of other defendants, but instead is whether the defendant demonstrated a substantial level of commitment to the conspiracy, either by engaging in a consistent series of smaller transactions throughout the life of the conspiracy, or by engaging in one substantial transaction (such as loaning a large amount of money to the network).
 
 
 30
 Leaving the conspiracy intact in our analysis does not mean that each defendant involved in the conspiracy here is responsible for the entire amount of drugs that flowed through the network over a three-year period. The "reasonably foreseeable" prong of the Pinkerton analysis, as repeated in the Guidelines, still remains. Indeed, reasonable foreseeability and conduct in furtherance of the conspiracy emanate from the same rationale. To say that certain conduct (e.g., selling X grams of heroin) is reasonably foreseeable to a defendant is also to say that it was in furtherance of the agreement for which he is responsible. This is true whether the inquiry takes place for the purpose of determining liability, or if it goes into the calculus for arriving at a sentence. Similarly, criminal actions that are not reasonably foreseeable to a particular defendant cannot be said to be in furtherance of the conspiracy to which the defendant agreed.
 
 
 31
 We are faced in this case with the conundrum of applying the concept of reasonable foreseeability to a drug conspiracy that spanned approximately three years and that included numerous supplier-wholesalers, middle-managers, and seller-retailers. In particular, the concept of foreseeability (a forward-looking concept) must be turned around 180 degrees and be applied to the conduct of co-conspirators occurring before the entry of a particular defendant into the conspiracy.
 
 
 32
 In the context of this case, it must be emphasized that reasonable foreseeability means more than subjective awareness on the part of individual defendants that Cole headed a long-standing and successful heroin distribution network. Given the notoriety of the Cole network, each defendant here can be ascribed with such awareness. Instead, conduct of co-conspirators--even past conduct--can be considered "reasonably foreseeable" to a particular defendant if that defendant has demonstrated a substantial degree of commitment to the conspiracy's objectives, either through his words or his conduct. Of particular importance in determining the level of commitment on the part of an individual defendant is the scope of the agreement between that defendant and his co-conspirators.
 
 
 33
 This Court has discussed reasonably foreseeable conduct in several cases. "[A] defendant who pleads guilty to a conspiracy charge is held accountable, for purposes of determining his relevant conduct and the applicable guideline range, for all drug transactions that he was aware of or that he should have reasonably foreseen." United States v. Guerrero, 894 F.2d 261, 267 (1990). The foreseeability inquiry places an appropriate check on a sentencing judge, preventing him from penalizing a defendant who was connected to a conspiracy, but whose involvement did not embrace the entire scope of the conspiracy. As stated in United States v. Smith, 897 F.2d 909 (1990), "not all crimes by co-conspirators are to be considered [in sentencing a particular defendant], but only conduct which the defendant could reasonably foresee in connection with the conspiracy." Id. at 911. While this Court has approved sentencing a defendant on the basis of the entire amount of drugs that flowed through the drug network, it has done so in cases where the drug transactions of other defendants were reasonably foreseeable to that defendant--for example, where defendant actually admitted that all of the enumerated transactions in a conspiracy were reasonably foreseeable. United States v. Savage, 891 F.2d 145, 151 (1989).
 
 
 34
 To be sure, other cases have held defendants liable for the entire quantity of drugs involved in a drug conspiracy. An examination of the facts in these cases reveals, however, that the defendants were substantially involved in the conspiracy and knew or reasonably should have known of the quantity of drugs handled by the conspiracy. In United States v. Williams, 897 F.2d 1034 (10th Cir.1990), certiorari denied, --- U.S. ----, 111 S.Ct. 2064, 114 L.Ed.2d 469, the court upheld the base offense level computed by the trial court based on an examination whether the defendant, the member of an ongoing conspiracy, "knew or should have known that at least such amount was involved." Id. at 1041. According to the trial court there, the defendant, by her own admission, knew of the total quantity of heroin involved in that conspiracy, so that the base offense level determination was appropriate. Id. The court rejected the defendant's contention in Williams that she should be held liable only for that amount of drugs she personally handled. On the contrary, where the defendant had "episodic but significant participation" in the conspiracy and took no effective steps to bring it to an end, she could be held responsible for the total quantity of drugs involved in the conspiracy. Id.
 
 
 35
 In United States v. Vinson, 886 F.2d 740 (4th Cir.1989), certiorari denied, 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990) the court upheld the determination of a defendant's sentence on the basis of the entire amount of cocaine in the conspiracy. Where the defendant transported cocaine regularly as part of a cocaine distribution network and where the defendant was actively involved in buying increasingly larger amounts of cocaine up until the time of arrest, the court held that it was not clear error to sentence the defendant on the basis of the entire amount of drugs in the conspiracy. Id. at 742-743. However, the court acknowledged that a defendant would be entitled to resentencing if he had been responsible only for a small amount of drugs but was sentenced on the basis of the entire amount of drugs distributed during the life of the conspiracy. Id. at 742.
 
 
 36
 Another decision, United States v. Record, 873 F.2d 1363, 1368 (10th Cir.1989), articulates the same limiting principle, stating that because it is essential to determine the kind of agreement entered into by each defendant, a defendant who simply makes two drug purchases in one year cannot be held accountable for drug sales of a different magnitude that were conducted years later. Id., citing United States v. Borelli, 336 F.2d 376, 384-385 (2d Cir.1964), certiorari denied, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555.
 
 
 37
 The decision in United States v. Farrell, 893 F.2d 690 (5th Cir.1990), suggests a broader rule. In Farrell, the court upheld an offense level based on 2,000 pounds of marijuana even though the defendant agreed to buy only 500 pounds of the same drug. Id. at 692. Justifying its decision to affirm the trial court's reliance on the higher amount, the court found the defendant to be a member of the conspiracy "that anticipated the purchase and distribution of at least 2,000 pounds of marijuana." Id. Farrell differs from Guerrero and Williams, for the court held that the defendant could be sentenced on the basis of the entire amount of drugs involved in the conspiracy since he was found guilty of the crime of conspiracy. See also United States v. Holland, 884 F.2d 354, 358 (8th Cir.1989).
 
 
 38
 Farrell rests on the broad assumption that all of the drugs that are involved in a conspiracy can be deemed reasonably foreseeable to an individual conspirator for sentencing purposes. Guerrero, which is the law of our circuit, rejects that view, as do the Sentencing Guidelines. In order for the entire amount of drugs distributed in a conspiracy to be reasonably foreseeable to a given defendant for sentencing purposes, relevant conduct is limited to "all drug transactions that [the defendant] was aware of or that he should have reasonably foreseen." Guerrero, 894 F.2d at 266. On this inquiry, the Government failed to sustain its burden as to a number of the defendants on appeal.
 
 
 39
 At the sentencing hearings, the district judge accepted the argument that because the conspiracy had distributed in excess of 10 kilograms of heroin, all of the defendants who were tried should be sentenced accordingly. As support for this approach, the judge cited three pre-Guidelines cases in which this Court imposed liability on a co-conspirator for acts of another co-conspirator if performed in furtherance of the agreed-upon conspiracy, "even if acts may have been performed before the member joined the conspiracy." United States v. Castillo, 814 F.2d 351, 355 (1987); United States v. Spudic, 795 F.2d 1334, 1337 (1986); United States v. Lynch, 699 F.2d 839, 842 & n. 2 (1982). Although these cases undeniably establish as a matter of conspiracy law that a Johnny-come-lately may be liable for acts committed before he joined, they also reveal a limiting principle that restricts imposition of criminal liability for conspiracy to the "agreed upon conspiracy," Castillo, 814 F.2d at 355; to the one conspiracy that was agreed upon, Spudic, 795 F.2d at 1337; and to "all overt actions of other conspirators intended to advance the scheme," Lynch, 699 F.2d at 842.
 
 
 40
 The district court erred in not considering the scope of the agreement each defendant here had with his co-conspirators. The decisions in Castillo, Spudic, and Lynch do not excuse a trial judge from applying the analysis mandated by the Sentencing Guidelines: was the conduct of other co-conspirators, for which the defendant is being held accountable, reasonably foreseeable? The only sensible way to answer this question in this case is to look at the level of commitment each defendant demonstrated towards achieving the conspiracy's goals as evidenced by the scope of the agreement that the defendant entered into with his co-conspirators.
 
 
 41
 The Government argues (Br. 36-37) that because the Guidelines merely approximate the standard for conspiratorial liability set forth in Pinkerton, 328 U.S. at 640, 66 S.Ct. at 1180, the sentences imposed by the district judge were proper. Pinkerton held that the overt act of a partner in a conspiracy is attributable to all of the members of the conspiracy. Id. at 646-647, 66 S.Ct. at 1183-1184. Therefore, under conspiracy law, where there is one agreement, a defendant who agrees to conspire will be held liable for those acts of co-conspirators that were in furtherance of the conspiracy, even if they were committed before he joined. Castillo, 814 F.2d at 355; Spudic, 795 F.2d at 1337.
 
 
 42
 The Government's argument begs the question of what each defendant conspired to do. To the extent that the Guidelines may approximate conspiracy law, the law does not support conspiratorial liability for every individual who deals with someone connected to a large drug distribution network. United States v. Townsend, 924 F.2d 1385, 1390 (7th Cir.1991). Under conspiracy law, "the scope of a conspiracy is determined by the scope of the agreement." Id. at 1392. Townsend dealt with sufficiency of the evidence challenges to a conspiracy conviction, and the Court addressed in detail the proper legal standard for determining the scope of a conspiracy. Townsend highlights the important distinction separating an agreement to conspire from any other association or affiliation with an organization: "To join a conspiracy, then, is to join an agreement, rather than a group. It follows that to be a conspirator you must know of the agreement." Id. at 1390. Reviewing the state of the law, Townsend stated that "[t]he creation of the Sentencing Guidelines did nothing to limit a conspirator's derivative exposure, because under the Guidelines conspirators must be sentenced on the basis of the total quantity of drugs the conspiracy can reasonably be estimated to have dealt in." Id. at 1389, citing United States v. Franklin, 902 F.2d 501, 504 (7th Cir.1990); United States v. White, 888 F.2d 490, 496-497 (7th Cir.1989).
 
 
 43
 Townsend 's reference to derivative liability under the Guidelines merely affirms that a conspirator who knows that by agreeing to conspire he is entering a large-scale conspiracy may be sentenced on the basis of the drugs that were part of the same course of conduct or agreement "whether or not the defendant was charged or convicted of possessing or distributing these additional amounts." Franklin, 902 F.2d at 504, citing White, 888 F.2d at 496-497. Townsend proceeded to place a desirable, and needed, check on the ability of conspiracy law to embrace any and all defendants who bear some relation, no matter how attenuated, to the conspiracy. Townsend properly notes that the construction of a conspiratorial hierarchy featuring a multitude of defendants does not provide proof positive that every defendant on the organizational chart belongs there. 924 F.2d at 1392. Instead, Townsend requires a trial court to scrutinize the agreement that an individual defendant entered into to determine whether he actually agreed to become involved in a conspiracy to distribute a given quantity of drugs--here more than 10 kilograms of heroin. Id.[1]
 
 
 44
 Townsend teaches that the Government must do more than allege that a particular defendant has entered some aspect of the conspiracy in order for a defendant to be held liable for the entire amount of heroin distributed during the course of the conspiracy. Id. at 1390. Townsend makes clear that conspiracy law contains an important limiting principle--namely, that conspiracy liability cannot exceed the scope of a defendant's agreement to further criminal activity. The Guidelines articulate the same limiting principle in terms of a requirement that those convicted of conspiracy may be sentenced only on the basis of acts committed in furtherance of the conspiracy that were reasonably foreseeable. The emphasis of conspiracy law on the scope of the agreement and the Guidelines on reasonable foreseeability have the same goal in mind. Both limiting principles prevent the conspiratorial net from being cast too wide. See id. at 1389.
 
 
 45
 Because the limiting principle underlying conspiracy law and the Guidelines is essentially one and the same, the Court's analysis in Townsend is helpful in construing the reasonably foreseeable requirement of the Guidelines. In order to sentence a defendant based on the entire quantity of drugs distributed in a conspiracy, when the defendant has joined the conspiracy in its late stages, it must be shown that those earlier transactions were reasonably foreseeable to him. The Government must show that the defendant agreed to a conspiracy whose scope included so large a distribution of heroin. The judge may sentence a late entrant on the basis of all the drugs distributed only if the earlier distributions occurred as part of the conspiracy to which the defendant agreed. A defendant who enters the conspiracy in its final stages, who was not linked to the earlier transactions or with the co-conspirators in any substantial way, and who bought or sold an amount of drugs that was minuscule in comparison to the 10 kilograms or more of heroin distributed may not be held responsible for all of the heroin distributed over the three-year period. Furthermore, he may not be sentenced according to all of the heroin distributed after he agreed to join the conspiracy if in agreeing to conspire, he reasonably foresaw a lesser amount. Applying these limiting principles to several of the defendants requires a remand of their cases for resentencing so that the base offense level may be recalculated.
 
 
 46
 C. Determination of Base Offense Level Under Guidelines
 
 
 47
 For sentencing purposes, the district judge treated those defendants who pleaded guilty differently from those defendants who were tried and convicted. Defendants David Dora, Lawrence Bates and Ronald McMillen pleaded guilty and, in exchange for their admissions, were sentenced to 121 months under Guidelines § 2D1.1. Initially, the court set the base offense level of these three defendants at 34, corresponding to between 3 and 9.9 kilograms of heroin. Guidelines § 2D1.1(a)(3). However, the Court proceeded to lower the offense level two points to 32, and then sentenced each of the three to the statutory minimum corresponding to an offense level of 32-121 months.
 
 
 48
 The trial court held the six defendants who went to trial responsible for considerably more heroin--indeed, for all of the heroin which was distributed during the course of the Cole conspiracy. Estimating that the organization made a daily distribution of one ounce from 1986 through 1988, the cumulative amount of heroin which flowed through the veins of the conspiracy exceeded 10 kilograms per year. Looking then to Guidelines § 2D1.1, the district judge assigned a base offense level of 36 to defendants Jimmy Lee Coleman, Leda Martin, Olanrewaju Raji, Jackie Edwards, Andre Stover, C.C. Hampton, and Eric Bennett. Having arrived at a base offense level of 36, the district court proceeded to impose sentences within the applicable Guideline range--188 months to 235 months, departing upward or downward where appropriate.
 
 
 49
 This base offense level of 36 provided the basis for sentencing each of these defendants individually, providing the point of departure for the sentencing judge to adjust the penalty for offense characteristics and the criminal history of the individual defendant. However, the district judge accepted that the conspiracy distributed 10 or more kilograms of heroin and proceeded to sentence each of the convicted defendants according to this amount.
 
 
 50
 Before turning to the determination of the base offense level for each of the individual defendants' sentences, we consider a claim made in the joint brief and by several of the defendants individually. The claim is that sentencing on the basis of 10 or more kilograms of heroin was clearly erroneous because the three defendants who entered into plea agreements, Dora, McMillen and Bates, were only sentenced on the basis of 3 to 9.9 kilograms of heroin. In the Government's view, however, the error occurred not in the sentencing of the appellants, but in the sentencing of Dora, McMillen and Bates, who were incorrectly assigned a base offense level of 34, because they entered into a plea agreement with the Government.
 
 
 51
 As we demonstrated above, the appropriateness of the base offense level turns on the quantity of drugs that was reasonably foreseeable to each defendant. This determination depends upon the scope of the conspiracy that each defendant entered into. We need not determine whether the district court was correct in setting the base offense levels for Dora, McMillen and Bates, for the disparity between sentences does not provide a basis for resentencing. See Fazio, 914 F.2d at 959 n. 15; United States v. Cea, 914 F.2d 881, 889 (7th Cir.1990); Guerrero, 894 F.2d at 267. The import of these cases is best illustrated by an example. A sentence which is mistaken, too draconian or too lenient as to co-defendant A does not grant co-conspirator B the license to benefit from a lighter sentence nor does it impose the added burden of a tougher sentence. If the sentence imposed upon a particular defendant falls within the applicable Guideline, then it will not be overturned on the ground that another defendant was sentenced differently. Guerrero, 894 F.2d at 267. See also United States v. Rios, 893 F.2d 479, 481 (2d Cir.1990). Of course, our holding here does not impose a bar on resentencing in the event that a sentence has been imposed in violation of a defendant's constitutional rights, for example, if a higher sentence was imposed because exculpatory evidence was improperly excluded, or if a defendant was prejudicially affected by his lawyer's ineffective assistance. Cf. id. at 268 (considering whether defendant should be resentenced because of Brady violation where prosecution failed to introduce evidence favorable to the defendant).
 
 D. The Individual Defendants
 Jackie Edwards
 
 52
 1. Edwards' challenge to his conspiracy conviction
 
 
 53
 Jackie Edwards, according to the Government's brief, occupied the position of wholesaler and procurer in the conspiratorial chain. In his individual brief Edwards challenges this characterization, claiming that the evidence was insufficient to convict him as a member of the Cole heroin conspiracy. We evaluate a sufficiency of the evidence challenge by viewing all inferences that reasonably can be drawn in a light most favorable to the Government. United States v. Durrive, 902 F.2d 1221, 1224 (7th Cir.1990). Edwards claims that the only evidence produced by the Government concerned one sale of heroin by Edwards to Cole. In order for Edwards to be guilty of the substantive count of conspiracy based on his single sale of heroin to Cole, it must be shown that Edwards knew of the existence of and scope of the conspiracy. As stated in Townsend, "evidence of a buyer-seller relationship, standing alone, is insufficient to support a conspiracy conviction. * * * The buy-sell transaction is simply not probative of an agreement to join together to accomplish a criminal objective beyond that already being accomplished by the transaction." 924 F.2d at 1394, discussing United States v. Ford, 324 F.2d 950, 952 (7th Cir.1963); e.g., United States v. Kimmons, 917 F.2d 1011, 1016 (7th Cir.1990) ("[t]he relationship of buyer and seller absent any prior or contemporaneous understanding beyond the mere sales agreement does not prove a conspiracy"); United States v. Baker, 905 F.2d 1100, 1106 (7th Cir.1990), certiorari denied, --- U.S. ----, 111 S.Ct. 206, 112 L.Ed.2d 167.
 
 
 54
 While Townsend describes the case in which a buyer-seller relationship, standing alone, would not support a conspiracy conviction, 924 F.2d at 1394, Edwards' challenge to his conviction on the basis of the existence of a single drug transaction is unavailing, for the Government showed that Edwards' role was not so limited as claimed, at least as it relates to the last two months of the conspiracy. The Government produced substantial evidence, Durrive, 902 F.2d at 1229, sufficient to support his conviction. A defendant's continuous involvement with a conspiracy raises an inference that he was aware of and involved in a conspiracy to a greater degree than a single, claimed transaction. United States v. Sergio, 934 F.2d 875, 879 (7th Cir.1991).
 
 
 55
 Here the Government introduced evidence that Edwards' role in the conspiracy predated the single sale of heroin to Cole (Tr. 1392-1394). Additionally, the Government introduced into evidence several recorded telephone conversations during which Cole discussed his personal and business heroin needs with Edwards. As noted previously, "telephone records are frequently and properly used as corroborating circumstantial evidence to establish the existence of a conspiracy." United States v. Noble, 754 F.2d 1324, 1329-1330 (1985) (citations omitted). Edwards and Cole discussed both the quantities and quality of heroin supplied (Telephone Tr. 3274, 3333, 3334, 3398, 3480). Other telephone conversations between members of the Cole organization made it clear that Edwards knew that various individuals were members of the Cole organization (Telephone Tr. 840, 2865, 4208). Recorded calls also revealed that after Cole had rejected Edwards as a procurer on account of the poor quality of the heroin, Edwards persisted, calling Cole in an attempt to sell more heroin to him (Telephone Tr. 4151, 4208, 4607). Finally, the in-court testimony by two witnesses demonstrated that Edwards was seen with Cole on ten to twenty occasions over a two-year period (Tr. 75-76, 289-290), that heroin was found at Jackie Edwards' residence after he was arrested (Tr. 722) along with other drug paraphernalia and that he kept a loaded weapon near his bedside (Tr. 740-748). This evidence was probative of Edwards' conspiracy, for juries must often infer the existence and scope of a conspiracy from circumstantial evidence. United States v. Paiz, 905 F.2d 1014, 1019 (7th Cir.1990).
 
 2. Edwards' base offense level
 
 56
 The district judge calculated Edwards' sentence on the basis of 10 kilograms or more of heroin, offering the following boilerplate explanation:
 
 
 57
 [U]nder the Guidelines, a defendant should be sentenced based on the actions of his co-conspirators which were done in furtherance of the conspiracy and which were known or reasonably foreseeable to defendant. * * * Applying these principles to the instant case, the court finds that the defendant is responsible for the total amount of heroin--over ten kilograms--distributed and attempted to be distributed by his co-conspirators during the life of the conspiracy from January 1986 through December 2, 1988.
 
 
 58
 Tr. 1397. This type of discussion approximates the kind of individualized inquiry that the sentencing judge must make in order that the defendant is sentenced only on the basis of a conspiracy that was reasonably foreseeable to him. However, district judges should conduct this inquiry in a less conclusory fashion, setting forth the reasons why the particular amount of drugs was reasonably foreseeable to him, with reference to the evidence before the court. As we stated previously: "Every sentence under the Guidelines must be supported by reasons. * * * 'Reasons' means something more than conclusions--a distinction important not only to the defendant whose future is at stake but also to the appellate process * * *." White, 888 F.2d at 495. The value of this inquiry was discussed in United States v. Herrera, 878 F.2d 997 (7th Cir.1989), where it was noted that "[s]pecific findings will both guide reviewing courts to the evidentiary basis for sentencing judgments, and also help the trial judge to identify matters relevant to application of the Guidelines." Id. at 1002, quoting United States v. Mejia-Orosco, 867 F.2d 216, 221-222 (5th Cir.1989), certiorari denied, 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602; United States v. Camargo, 908 F.2d 179, 185 n. 3 (7th Cir.1990); see also United States v. Agyemang, 876 F.2d 1264, 1274-1275 (7th Cir.1989) (Cudahy, J., concurring).[2] Before concluding that a given quantity of drugs was foreseeable for sentencing purposes, the district judge should make clear that he has considered the evidence of the individual defendant's agreement to join a conspiracy of the scope alleged by the government. See United States v. Johnson, 935 F.2d 47, 51-52 (4th Cir.1991) (Guidelines "mandate an open, on-the-record, reason supported [sic] determination of the principal components of a guidelines sentence, including the determination of the applicable guidelines range"); 18 U.S.C. § 3553(c) (requiring sentencing judge to state in open court the reasons for the imposition of a particular sentence). Because the district judge offered a generic explanation for assigning the same base offense level to each of the defendants, it must be determined, on a defendant-by-defendant basis, whether Edwards and the other defendants have offered meritorious arguments for remanding their cases for resentencing.
 
 
 59
 From the evidence introduced, it was within the jurors' discretion for them to conclude that Edwards conspired to distribute heroin. However, virtually all the evidence points to Edwards being an insubstantial supplier who made a late entrance into the conspiracy. His one proven sale of heroin to the organization, as well as all the telephone conversations mentioned above, occurred less than two months before federal agents arrested the defendants. The only evidence linking Edwards to the conspiracy before this two-month period is the witness testimony that places Edwards with Cole on various occasions. On cross-examination, both of these witnesses admitted that they had never seen Edwards deliver or sell heroin to Cole, and had never heard Cole say he was getting or had ever gotten heroin from Edwards (Tr. 159, 333-334).
 
 
 60
 Because there is no evidence that Edwards entered into an agreement to become part of Cole's heroin conspiracy before October 1988, his base offense level must be recalculated to reflect the quantity of heroin that was reasonably foreseeable to him.
 
 Leda Martin
 
 61
 Defendant Martin also challenges the district judge's sentencing on the basis of 10 kilograms or more of heroin, claiming that the court made no individualized assessment as to the amount of heroin that was reasonably foreseeable to her. She also disputes the district court's adjustment of her sentence upwards, because it found Martin to be a manager or supervisor in an organization that had five or more participants. We conclude that the sentencing judge did not clearly err in adjusting upwards Martin's sentence for her role as a manager. As to the base offense level, Martin argues that the judge should have conducted an individualized inquiry into the amount of drugs reasonably foreseeable to her. See Camargo, 908 F.2d at 185 n. 3; Herrera, 878 F.2d at 1002 (discussed supra ). However, she simply challenges the failure of the sentencing judge to do this, without presenting any facts that support her claim that she should have been sentenced based on the lesser amount.
 
 
 62
 At sentencing, the district judge did in fact consider expressly the amount of drugs reasonably foreseeable to Martin. He used the same boilerplate language, however, that he used with Edwards, concluding that Martin was responsible for the entire 10 kilograms of heroin (Tr. 1448-1449).
 
 
 63
 Despite the preference of this Court for a more explicit, considered approach to reasonable foreseeability, defendant Martin has not given any ground for concluding that the conspiracy she entered into was a narrower one, or that the amount of heroin was not reasonably foreseeable to her. On the contrary, at his direct examination, government witness Haussian Evans testified that he delivered heroin packages to Leda Martin's house in " '86, '87, and '88" (Tr. 275). As a manager, Martin came into contact with the gamut of the organization's distribution network. Due to her extensive involvement in the Cole conspiracy throughout the three years of its duration, Martin, unlike several other defendants, cannot argue that 10 or more kilograms of heroin was not foreseeable due to her late entry. Moreover, Martin was a manager in the Cole organization. Indeed, she played an integral role in the day-to-day operation of the distribution network. Therefore, the district judge did not err when he concluded by a preponderance of the evidence that 10 or more kilograms of heroin was reasonably foreseeable to Martin.
 
 Olanrewaju Raji
 
 64
 As with the previously discussed defendants, the district judge concluded that Raji was responsible for the total amount of heroin involved in the conspiracy (Tr. 1433-1434). Accordingly, he determined Raji's base offense level to be 36. On appeal, Raji makes two arguments in support of resentencing. First, he claims that he should be resentenced based on the disparity between his sentence and those of joint co-conspirators Dora and Bates. As already explained, this argument is unconvincing.
 
 
 65
 Raji's second ground for resentencing merits closer consideration. On appeal, Raji claims that according to the evidence, 10 kilograms of heroin was an inappropriate amount on which to base his sentence because his involvement in the conspiracy did not commence until May 1988 at the earliest. Since the district judge offered the same generic explanation for calculating Raji's base offense level, it must be determined whether Raji has offered a meritorious basis for remanding his case for resentencing.
 
 
 66
 Unlike Leda Martin, Raji has made reference to specific evidence in claiming that the trial judge erroneously concluded that 10 or more kilograms of heroin was foreseeable to him. He claims that the evidence made him a late entrant into the conspiracy. At the earliest, Raji's involvement did not begin until May 1988, at which time the Government intercepted a telephone call made from Raji's residence to Marlowe Cole's residence (Tr. 556). According to Raji, his involvement did not begin until October 5, 1988, the date on which the Government first intercepted a telephone conversation between Cole and Raji (Tr. 205).
 
 
 67
 The Government responds that Raji was a heroin supplier, yet concedes in its brief that Raji was a steady supplier only during 1988 (Tr. 66, 553-560, 567; Bennett Tr. 51-53; Telephone Tr. 318, 3173, 3179). It appears that the Government's only evidence of Raji's earlier involvement consisted of references by Cole to Raji by nickname--"the African." However, Raji's name did not appear on the list of 41 names on a confidential source list of the Cole organization's personnel (Tr. 330), and neither Ontario or Haussian Evans, the two insider witnesses, testified that they knew Raji. In fact, they testified that they did not see him before the December 2, 1988 arrests (Tr. 155, 330). C.C. Hampton, who was a manager in the distribution chain, also testified that he had no knowledge of Raji until the arrests were made (Tr. 1045, 1047).
 
 
 68
 While Raji by his own admission sold heroin to Cole, the evidence does not support his involvement until late in 1988, only a few months before the Government cracked open the conspiracy by arresting Raji and the other members of the Cole organization. Raji was liable for conspiracy, but his role as co-conspirator was more limited, and he should be resentenced to reflect his late entry into the conspiracy, for the amount of heroin reasonably foreseeable to him must be less. United States v. North, 900 F.2d 131, 133-134 (8th Cir.1990) (holding that sale of drugs between defendant and another co-conspirator supported a more limited objective than the overall conspiracy and that defendant should be sentenced for lesser quantity of drugs).
 
 Andre Stover
 
 69
 Like Raji, Andre Stover (also known as "Cisco") was a late entrant to the conspiracy. He came into the organization on November 10, 1988 (Tr. 1406), less than a month before federal agents arrested the defendants. The district judge did not take Stover's late matriculation into account and sentenced him based upon 10 or more kilograms of heroin. At Stover's sentencing hearing, the court justified the base offense level by delivering the same boilerplate explanation--Stover could be held liable for past acts of co-conspirators which were committed before he joined the conspiracy, but that were also reasonably foreseeable.
 
 
 70
 In arguing that he had been erroneously sentenced, Stover cites the indictment, which alleged that the first heroin transaction involving Stover transpired on November 10; the telephone records, which do not reveal telephone conversations between Cole and Stover occurring before November 10; the Presentence Investigation Report ("PSI"), which only attributed to Stover the heroin distributed after November 1988; and the actual quantity of heroin distributed during the final month of the organization's operation. At most, Stover concedes that 644 grams of heroin were distributed during the period from November 10 through December 2, and this amount falls substantially short of the 10 kilograms upon which the district judge based Stover's sentence.
 
 
 71
 The Government attempts to link Stover to the earlier years of the conspiracy, claiming that Stover had visited Cole's house on frequent occasions (Tr. 72-74, 620-625, 630-633, Telephone Tr. 3224), and that Stover had knowledge of the Cole organization and its operations (Telephone Tr. 3227/3229, 3278, 3287, 4145, 4208, 4274, 4530, 4782/4786, 5220, 5373). However, this evidence merely established that Stover was seen in the presence of Cole on several occasions, that Stover knew certain members of the Cole organization, and, on one occasion, that Stover purchased videotapes from Cole. Before November 1988, there is no evidence that Stover entered into an agreement to become part of the Cole organization's heroin conspiracy. Therefore, Stover's base offense level must be recalculated to reflect the quantity of heroin that was reasonably foreseeable to him.
 
 Jimmy Lee Coleman
 
 72
 Jimmy Lee Coleman challenges the district court's determination of his base offense level based upon 10 or more kilograms of heroin. Coleman's position is very much like that of his live-in girlfriend Leda Martin. Together, they held positions in the Cole organization as managers and, as demonstrated in the section of this opinion discussing Martin's role, presided over the organization's distribution network. Given Coleman's involvement throughout the three years of the Cole organization's operation, nothing contained in the joint brief persuades us that the district judge erred in concluding that 10 or more kilograms of heroin was reasonably foreseeable to Coleman for sentencing purposes.
 
 C.C. Hampton
 
 73
 Hampton faults the sentencing judge for failing to make an individualized determination as to the amount of heroin reasonably foreseeable to him. While Hampton admits that he purchased heroin from the Cole organization as early as 1986, he asserts that he did not agree to conspire with the Cole organization until September or October of 1988. Therefore, Hampton argues that he should be sentenced only upon the quantity of heroin that was distributed during the final months of the conspiracy.
 
 
 74
 The Government, in contrast, groups Hampton with the other two managers, Leda Martin and Jimmy Lee Coleman. According to its brief, Hampton occupied the role of a manager in the heroin distribution network. The in-court testimony of the Evans brothers shows that they made drug deliveries to and money pick-ups from Hampton throughout the three years of the conspiracy (Tr. 30-33, 45-46, 89-90, 162-164, 271-275). Therefore, Hampton's claim that he was a late entrant into the Cole organization is contradicted by the evidence. That Hampton was also a consumer throughout the conspiracy does not negate the managerial role that he played. Consequently, we conclude that he was properly sentenced based upon 10 or more kilograms of heroin, although it would have been preferable for the district judge to have made specific reference to the evidence in determining Hampton's base offense level. E.g., Herrera, 878 F.2d at 1002.
 
 Marlowe Cole
 
 75
 Cole does not challenge the district judge's determination of his base offense level in his individual brief. He pleaded guilty to the conspiracy and entered into an agreement with the Government as to his sentence. Therefore, there is no need to decide whether the sentencing judge considered the appropriate amount of drugs in determining Cole's base offense level. In any event, Cole stood at the head of the heroin conspiracy. His involvement extended over the entire course of the conspiracy and he oversaw the operation of the organization, so that he has no credible basis for denying that the entire amount of heroin distributed was reasonably foreseeable to him.Eric L. Bennett
 
 
 76
 Although he was tried separately, the district judge delivered the same routine explanation for calculating Bennett's base offense level. The trial court held Bennett responsible for all of the heroin that was distributed throughout the course of the conspiracy, even though the only evidence introduced at trial showed that Bennett sold heroin for cash from the end of October through December 2, 1988 (Supplemental Appendix of Eric Bennett at 1). Bennett's PSI recommended that he be held responsible only for the amount of heroin distributed during the time that he actually sold heroin for the Cole organization. The Government objected, however, and recommended that Bennett be sentenced on the basis of the entire amount of heroin because he was a user of heroin prior to joining the conspiracy himself and because he lived across the street from Cole's workhouse. Although the Government agreed that Bennett's actual involvement in the conspiracy did not commence until the end of October 1988, it asserts that as a user of heroin he knew of the existence and scope of the conspiracy before he joined it. Therefore, the Government claimed that the entire amount of heroin was reasonably foreseeable to him.
 
 
 77
 Reasonable foreseeability refers to the scope of the agreement that the defendant entered into when he joined the conspiracy, not to the drugs defendant may have known about as a function of his individual consumption. As a matter of conspiracy law, defendant can be convicted for being part of a conspiracy where some acts of co-conspirators were committed before he joined. Castillo, 814 F.2d at 355; Spudic, 795 F.2d at 1337, and Lynch, 699 F.2d at 849 & n. 2. But that is not say that a defendant can be held liable for those acts specifically. To sentence a defendant based on the entire amount of drugs distributed requires that this amount be reasonably foreseeable with respect to the agreement that the defendant entered into. He may not be held responsible for the total quantity of drugs simply because he might have been aware that Cole operated a large-scale drug organization.
 
 
 78
 Bennett was a street dealer in the Cole organization and did not become involved in the conspiracy until its final months. Therefore as a "retailer" he was not necessarily privy to the larger mechanics of the Cole organization. As a late entrant, he distributed a limited amount of heroin. Accordingly, the district judge must recalculate Bennett's base offense level based on the lesser quantity of heroin that was reasonably foreseeable to him.
 
 Reggie Griffin
 
 79
 Griffin pleaded guilty to conspiracy and to possession of heroin with the intent to distribute the drug through the commercial channels of the Cole organization. There is a discrepancy, however, between the plea that Griffin entered into and the conspiracy for which he was sentenced. Griffin claims that the agreement that he entered into was narrower than a conspiracy to distribute 10 or more kilograms of heroin. Griffin only admits responsibility for the sale of one ounce of heroin to Cole for personal use in November 1988. This transaction represents the only sale by Griffin of heroin and represents the beginning of his involvement in the distribution of heroin. Before November 1988, Griffin, by his own admission, was a regular customer of the Cole organization, and he was familiar with the street dealers who worked for Cole. However, until he facilitated the sale of one ounce of heroin in November 1988, Griffin played no part in the distribution of heroin.
 
 
 80
 The district judge calculated Griffin's base offense level with reference to the entire quantity of heroin distributed over the three years of the conspiracy and offered the usual boilerplate explanation justifying the base offense level. At defendant's sentencing hearing, the judge made the identical conclusory statement that the entire amount of heroin was reasonably foreseeable to Griffin under the Guidelines. In view of Griffin's narrower agreement to facilitate the sale of one ounce of heroin during the final days of the Cole organization's existence, he should be sentenced for the quantity of heroin that was reasonably foreseeable to him as a result of the narrow agreement. North, 900 F.2d at 131.Ronald McMillen
 
 
 81
 McMillen pleaded guilty to conspiracy to distribute in excess of one kilogram of heroin and was sentenced to 121 months in prison. Unlike the other defendants, his offense level was 32, computed on the basis of one kilogram of heroin. Consequently, McMillen does not challenge the computation of his offense level. He asks to be resentenced because he was deprived of the statutorily mandated ten days to review his PSI before the sentencing hearing, in violation of Federal Rule of Criminal Procedure 32(c)(3)(A).
 
 
 82
 The Government agrees that McMillen should be resentenced since he was given only one hour before his sentencing hearing to read his pre-sentence investigation report (Br. 62-63). At his sentencing hearing, he protested to the trial judge that he had not had enough time to read it. This time brevity violates Federal Rule of Criminal Procedure 32(c)(3)(A), which states in relevant part that:
 
 
 83
 At least ten days before imposing sentence, unless this minimum period is waived by the Defendant, the Court shall provide the Defendant and the Defendant's counsel with a copy of the report of the presentence investigation * * *.
 
 
 84
 Fed.R.Crim.P.Rule 32(c)(3)(A). This language is replicated in 18 U.S.C. § 3552(d), requiring disclosure ten days before sentencing unless waived.
 
 
 85
 McMillen claims that Rule 32 requires that he be given ten days to review the PSI, while the Government concedes only that McMillen should be given "sufficient opportunity" (Br. 63). The difference of opinion arises from the Government's belief that McMillen waived his right to have ten days to review the PSI when he fled the jurisdiction and was absent from his original sentencing hearing. As authority, the Government cites United States v. Busche, 915 F.2d 1150 (7th Cir.1990), where this Court held that defendant waived his right to the full ten days when he participated in the sentencing hearing without objection. Id. at 1151. The defendant's participation in sentencing in Busche stood as an implicit waiver sufficient to override the explicit 10-day requirement of the Rule. We are not persuaded that fleeing the jurisdiction constitutes waiver for the purposes of the Rule and § 3552(d). The notion of waiver here has to do with a defendant willingly allowing his sentencing hearing to occur before the statutorily mandated ten days has expired. Fleeing the jurisdiction may subject a defendant to a host of additional penalties, but an inadequate amount of time to review a PSI is not one of them. McMillen will have to be resentenced and, so long as he does nothing to waive his statutory right to examine the PSI this time, he shall have ten days to review the report before sentencing.
 
 III. CONCLUSION
 
 86
 Defendants have raised a host of other claims jointly and individually. Since they are plainly without merit, they will not be discussed herein. McMillen and those defendants for whom 10 kilograms or more of heroin was not reasonably foreseeable[3] must be resentenced, while the sentences of the other defendants, who were involved in the Cole organization for the entire duration of the conspiracy, will not be disturbed. In all other respects, the judgment of the trial court is affirmed.
 
 
 
 [1]
 Indeed, it has come to our attention that some district judges presiding over conspiracy cases in this Circuit have now instituted special pretrial hearings in light of Townsend, dubbed "Townsend hearings." At these hearings, the trial judge scrutinizes the Government's evidence as to the scope of each individual defendant's agreement to determine whether what the Government has charged as a single conspiracy may, in fact, constitute several
 
 
 [2]
 For an example of the kind of specific fact-finding that a district judge should undertake in calculating a sentence, see the thorough sentencing memorandum prepared by Judge Miller in United States v. Tolson, 760 F.Supp. 1332 (N.D.Ind.1991)
 
 
 [3]
 They are Edwards, Raji, Stover, Bennett and Griffin